# GRAFTON,

## DECEMBER TERM, A. D. 1851.

---

### BRYANT'S CASE.

The court of common pleas has the power to suspend or remove an attorney from office, although he may have been admitted to practice by the superior court, under section 7, chap. 177, Rev. Stat., upon the ground that he is a citizen of the State, twenty-one years of age, and of good moral character.

Corrupt and fraudulent conduct is a sufficient ground for the suspension or removal of an attorney from office.

But ignorance of the law is not a cause for the suspension or removal from office of a person admitted to practice as an attorney under section 7, chap. 177, Rev. Stat., as the statute does not make a knowledge of the law one of the requisites for admission.

PETITION, addressed to the court of common pleas, for the suspension or removal from office of John S. Bryant, an attorney, admitted to practice under the provisions of section 7, chap. 177, of the Revised Statutes.

It was alleged in the petition that at the October term, 1848, of the court of common pleas for this county, an action was pending in favor of William P. P. Pollard against Alexander Pollard, and also an action in favor of the same plaintiff against the defendant and Vianna Pollard, his wife, in which action C. R. Morrison, Esq., appeared for the defendant for the purpose of adjusting the matter in controversy, and of giving the plaintiff judgment; that John S. Bryant, Esq., also appeared in defence of the actions, stating that he did so for the purpose of saving the rights of Mrs. Pollard in the suit of *Pollard* v. *Pollard*, and that he appeared generally for Pollard and wife in the other suit; that Bryant made his affidavit that he had authority from Alex-

ander Pollard to appear for him in the action against him and his wife, and file a disclaimer, or defend the suit in any way he thought proper to save the rights of others, if he would do it without subjecting Pollard to costs, and that this affidavit was wholly untrue.

It was also alleged that Bryant procured both the actions to be continued, contrary to the wishes and greatly to the injury of the petitioner; and that he still continues to appear in the actions, contrary to the wishes of the petitioner; that he never in any manner retained or authorized Bryant to appear for him or for his wife, as the attorney of either of them, or to interfere with the actions in any way whatever.

The petitioner then prayed that the court would inquire into the matter, and require Bryant to show his authority for appearing in the suits; and if it should be found that he appeared without authority, that he should be suspended or removed from his office as an attorney.

A commissioner was appointed by the court, and depositions were taken and laid before the court.

The evidence tended to show that in the month of February, 1837, one Rollins sold to Pollard and his wife a farm in Benton, for the sum of four hundred and fifty dollars. Mrs. Pollard, in the presence of her husband, produced the sum of three hundred dollars, and paid it to Rollins. She then made a note for one hundred and fifty dollars, and delivered it to Rollins with a mortgage to secure its payment, and he conveyed the land to her alone. In the month of March, 1849, Asa Thurston, who had attached the equity of redemption in this land, released all his interest to Bryant. William P. P. Pollard held a mortgage, signed by Pollard and his wife, subsequent in date to the Rollin's mortgage, and also held a note against Alexander Pollard, and one against Pollard and his wife. He caused two suits to be commenced; one against Pollard, and one against Pollard and his wife, returnable at the October term, 1848. On the thirty-first day of July, 1848, Bryant brought an action in the name of Rollins, upon the note for one hundred and fifty dollars,

against Alexander Pollard.   Upon the back of this writ was the
following writing : "This suit is dropped and withdrawn, because
the within named Alexander Pollard claims nothing in the prem-
ises by virtue of the deed for which the within described note
was given.

    July 31st, 1848.                    Alexander ⋈ Pollard,
                                by James J. Page.

  J. S. Bryant, plaintiff's attorney."

This writing was signed by the advice of James J. Page, a
person who appeared as the friend of Pollard, and who, though
not a lawyer, declared it as his opinion that the writing could not
injure Pollard.   There was evidence that Bryant had declared
that he had a quitclaim deed from Mrs. Pollard, releasing to him
all her interest in the mortgaged premises.   After the actions in
favor of William P. P. Pollard against Alexander Pollard had
been entered, Mr. Morrison entered his appearance generally
for the defendants, being desired to do so by Alexander Pollard,
in order that the plaintiff might have judgment, and all further
costs might be avoided.   Bryant also entered his appearance
generally for the defendants, and moved that the actions be con-
tinued.   To this Mr. Morrison objected, but they were finally
continued by order of the court.   At a subsequent term Pollard
appeared in court in person, and desired that the plaintiff should
take judgment, to which Bryant still objected, and the actions
were again continued.   Bryant being called upon at the October
term, 1848, for his authority to appear and answer to the ac-
tions, made his affidavit, stating that Pollard authorized him to
appear in the suits and enter a disclaimer, or defend in any way
he thought proper to save the rights of others, if he would do it
without subjecting Pollard to costs.   At the same time Bryant
filed a disclaimer on the part of the defendant.

  The evidence was quite contradictory as to the ground upon
which Bryant placed his authority to appear in the suits.   It was
in evidence that soon after the actions were entered, the counsel
for the plaintiff asked Bryant for whom he appeared, and that he

answered that he did not appear for Alexander Pollard at all, but appeared for his own interests, and that Mrs. Pollard desired him to appear, saying that she never signed the notes and that they were fraudulent; that upon the question of a continuance coming before the court, Bryant declared that he had a written authority from Alexander Pollard to appear, but he did not produce it. At a subsequent term Bryant said he continued to appear on the authority of the affidavit he had filed. This was after the present complaint had been entered. On the last day of the term, Bryant said he appeared to save the rights of Joseph Rollins. Mr. Morrison's impression was, that in one suit Bryant said he had authority from Alexander Pollard to appear, but in the other suit he said he appeared to save the rights of third persons; that in the suit upon the mortgage, Bryant did not state for whom he appeared until he filed his affidavit; but previously, upon being repeatedly questioned, he said he appeared for Alexander Pollard. The weight of the evidence, on the whole, was that Bryant had no authority from Pollard to answer to these suits.

The questions arising upon these facts were transferred to this court, because the court of common pleas entertained a doubt whether they could exercise any authority over attorneys who appear by virtue of an admission to the bar of the superior court, upon the ground that they are persons of good moral character.

*Sargeant,* county solicitor, for the State.

*Bryant, pro se.*

GILCHRIST, C. J. It is provided by § 7, chap. 177, Rev. Stat., that "if an attorney shall be charged with any fraud or malpractice, or any contempt of court, the court shall inquire into such offence in a summary manner, and if found guilty he shall be suspended or removed from office." This provision we have been unable to find in the edition of the laws published in 1830, or in any of those published before that time. The reason

of this is probably to be found in the alteration of the laws made by the second section of the same chapter, which enacts that " any citizen of the age of twenty-one years, of good moral character, on application to the superior court, shall be admitted to practice as an attorney." The legislature probably thought that this provision rendered it necessary that a more stringent authority than had before been the subject of legislation, should be expressly vested in the court. It is not surprising that this feeling should exist. Mere certificates of good moral character, which can so readily be procured by any one who has not been convicted of an offence, cannot supply the want of study, of reflection, and of that intellectual training, which, among a people so intelligent as ours, can alone render persons competent to take charge of litigated cases in court, involving as they do the life, liberty, reputation and property of so many of their fellow citizens.

The powers of an attorney, as an officer of the court, are very extensive. He may waive objections to evidence, make admissions in pleading or by parol, enter nonsuits and defaults, and may make any disposition of the suit and any admission of facts that the party himself could make. *Woodbury, J., Alton* v. *Gilmanton,* 2 N. H. Rep. 520. So much, therefore, being entrusted to him, it is the more important, under the present statute, that the scrutiny into his conduct and the control over his discharge of his duties should be searching and summary.

An attorney, for procuring judgments to be entered in three several actions of debt, every one of them being above the sum of forty pounds, and so finable to the king, " no original writs being sued forth, he himself having received the charges for suing the originals, as well for the fine to the king as for the said writs, *and because it was done voluntarily*, in deceit of the king for his fines, and against his oath as attorney that he should not practice any deceit, it was ordered that he should be put out of the roll of attorneys, and be cast over the bar and committed to the Fleet, but no fine was imposed on him, *quia pauper.*" *Jerome's Case,* Cro. Car. 74. In a case where there was a rule to show cause why the attorneys for the plaintiffs hould not pay the

debt and costs for not having declared against the defendant within two terms, whereby the defendant obtained his discharge, Lord *Mansfield* said that an attorney should not be answerable for *every* error or mistake, and be punished for it by being charged with the debt which he was employed to recover; that the attorneys were far from having been guilty of any gross misbehaviour; that they were not grossly ignorant, or grossly negligent, or intentionally blamable, and might not and probably did not know that this point (to which he had referred,) was settled. *Pitt* v. *Yalden*, 4 Burr. 2060. A person convicted of felony was struck off the roll of attorneys, because it was held that it was not proper he should continue a member of a profession which should stand free from all suspicion. *Exparte Brownsall*, Cowp. 829. The court will award an attachment against an attorney for fraudulent practice. Com. Dig., Attorney, (B. 15.) Attorneys are officers of the court, and liable to be punished in a summary way, either by attachment, or by having their names struck out of the roll of attorneys, for any ill practice attended with fraud and corruption, and committed against the obvious rule of justice and common honesty; but the court will not easily be prevailed upon to proceed in this manner, if it appears that the matter complained of was rather owing to neglect or accident than to design. *Bac. Abr.*, *Attorney H.* But the court will not interfere upon motion, and compel an attorney to pay costs to his client, where there is no fraud, but negligence merely, as that can only be the subject of an action. *In re Jones*, 1 Chitty's Rep. 651. Nor will the court exercise its summary jurisdiction over an officer of the court, unless a case of gross fraud be made out. *In re Lord*, 2 Scott 131. Where an attorney commenced an action without being retained for that purpose, and failed in the suit, it was ordered that he should pay to the defendant his costs in ten days after notice of a rule upon him, or that he should be suspended from all practice as an attorney until the costs should be paid. *Anonymous*, 2 Cowen 589. An order was made on the 15th of September to stay proceedings in a cause, and on the 13th day of October the

plaintiff's attorney served the defendant's attorney at Rochester, a distance of thirty miles from the place of trial, with an order from a commissioner, bearing date the eighteenth of September, vacating the order to stay the proceedings made on the 15th of September, and on the same day took an inquest in the cause. The vacatur was granted without notice to the defendants. The court, (*Marcy, J.*,) said that they approved and would encourage vigilance, but felt it their duty to punish overreaching and oppressive practice, and the inquest was set aside with costs. *Smith* v. *Brown*, 2 Wend. 245.

The result of the authorities is, that for a mere mistake the court will not punish an attorney, as for that he may be made answerable in damages upon an action ; but for fraudulent and corrupt practice he may be removed from office.

In the present case, it appears that in the month of March, 1849, Thurston had attached the equity of redemption in the land. Rollins had conveyed the land to Vianna Pollard, the wife of Alexander Pollard, and she had mortgaged it to Rollins to secure the payment of a part of the purchase money. Alexander Pollard and his wife then mortgaged the land to William P. P. Pollard. Thurston having this interest by his attachment, then released it to Bryant. W. P. P. Pollard sued Alexander Pollard, and also Pollard and his wife, the writs being returnable at the October term, 1848. From the agreement stated in the case, it appears that Alexander Pollard claimed no interest in the land mortgaged by his wife to Rollins, and that he did not wish the costs to be accumulated in the actions brought by W. P. P. Pollard against him, and therefore desired to give the plaintiff judgment. Bryant alleged that he had authority from the defendant to appear for him, provided he should not be subjected to costs, and made an affidavit to that effect. But it appears from the case that he made various statements in relation to his appearance, which were that he did not appear for Alexander Pollard at all, that he appeared for his own interest, that Mrs. Pollard desired him to appear, at a subsequent term that he

appeared on what he styled " the authority of the affidavit," and finally that he appeared to save the rights of Joseph Rollins.

The proper course for Bryant to pursue was plain. If he supposed he had an interest in the land by reason of the release from Rollins, which required to be protected against the plaintiff, he should have applied to the court for leave to appear and defend his rights and answer to the action; and such leave would have been granted him on showing his interest, and indemnifying Pollard against all costs arising from his intervention. His case would have come within the principle which is applied in the case of subsequent attaching creditors, and which permits a person in some cases to use the name of another to enforce his own rights. *Blaisdell* v. *Ladd*, 14 N. H. Rep. 129; *Webb* v. *Steele*, 13 N. H. Rep. 236. But almost any course would have been better than the course he pursued; for the positions he took were inconsistent with each other, and all his statements could not have been true. He evidently did not know how to protect his interest in the land. But he did not mean to lose sight of it, and in looking after his interest, and fixing his eyes constantly upon that, he lost sight of the truth, and that is, in great measure, the cause of his present difficulty. He might have supposed that he had a right to appear in the name of Pollard, without any authority from him, and dispose of the suit because he had some interest in the land. But an attorney who appears in a case without authority, places himself in a hazardous position. 2 Cowen 589, before cited. An attachment lies against an attorney for taking upon him to prosecute or defend a suit for another, without any manner of directions from him. Hawk., book 2, chap. 22, § 6. The weight of evidence is that Bryant had no authority to appear for Pollard. If his course could be shown to proceed from any fraudulent or corrupt motive, if he intended to do wrong, we should have no hesitation in suspending or removing him from office. But the evidence does not satisfy us that he intended to commit a wrong, either against Pollard or against any other person. It is true he appeared for Pollard without any authority; but it is not improb-

able, that, supposing he had an interest, he thought he had a right to appear and defend it without reference to Pollard. But he was ignorant of the law and the practice, and being thus ignorant, and perhaps embarrassed and uncertain what course to pursue, he said whatever he thought would answer the immediate purpose, without looking beyond it. This course may fairly enough be presumed to have resulted from his ignorance of the law, and not to have proceeded from that corrupt and fraudulent motive mentioned in the cases referred to.

This brings us to the question whether, in the present state of the law, mere ignorance of the law, however gross, can authorize the court to remove an attorney from practice. But how can the court possess this power, when the statute declares that any citizen, twenty-one years of age, and of good moral character, shall, on application, be admitted to practice as an attorney? The statute requires no knowledge of the law, no acquaintance with the practice, and no education whatever. The applicant may be destitute of even the rudiments of an education. He may be unable to read or write. He may subscribe the oaths to the constitution and of office, by making his mark. But if he come within the statute, he must be admitted. It has been sometimes thought that attorneys, who take such an important part in the administration of justice, should be reasonably familiar with those great principles which for some hundreds of years have formed the foundation of government, have settled domestic relations, have fixed the construction of contracts, and have secured the rights of persons and of property to all who speak the English language. If these could be dispensed with, some knowledge of the ordinary rules of practice, or, at least, of the distinction between the forms of action, has been supposed to be necessary. But the statute dispenses with all this. It does not require so much education in an attorney, to whom such momentous interests are entrusted, as it requires in the teacher of a district school. A school mistress must be qualified to teach the English language grammatically, and the rudiments of arithmetic and geography. Rev. Stat., chap. 43, § 9. But the stat-

ute does not require that the studies of an attorney should have been prosecuted so far.

Any thing that tends to lower the standard of professional acquirements among those whose duty it is to investigate and defend the rights of others, is to be lamented. Every man may be a plaintiff or defendant. Every man may have a right to enforce, or an unjust claim to resist. It would seem to be more for the public good, that when he applies to an attorney for advice he should have security, from the attorney's previous study of his profession, that he is reasonably competent to discharge his trust. There is no class of men whose advice in their particular calling is more generally followed than the class of attorneys. More implicit confidence is reposed in them, for personal honor and devotion to their duties, than in any other persons. Secrets, involving all that renders life valuable, are confided to them, upon the mere security and belief that they will not violate a professional confidence. Evidences of debt and of rights to property are placed in their hands, for whose return other security than their professional trust is rarely required. It is even more important for the interest of the public than of the attorneys that this high character should continue to be deserved as it has been. And it is with a full conviction of the importance of preserving the standard of professional qualifications, that we have been, nevertheless, constrained to come to the result, that ignorance of the law in an attorney does not authorize the court to suspend or remove him from office, as a contrary doctrine would render it necessary that an attorney should possess some knowledge of the law—a condition which the statute does not require.

We have no doubt that although applicants for admission to practice on the ground of their good moral character, are to be admitted by the superior court, yet they may be removed from office, or suspended from practice in the common pleas, by that court, upon good cause shown. Such a power is necessarily inherent in every court, in order to enable it to discharge its duties, as much so as the power to preserve order. Every reason for vesting such a power in the superior court exists with equal force

in relation to the court of common pleas, and as the statute has not deprived that court of its authority in this particular, it must still possess it.

*Petition dismissed.*