Rockingham
No. 81-461

MARY K. BILODEAU, ADMINISTRATRIX OF THE ESTATE OF DONAT BILODEAU, & a.

v.

RICHARD ANTAL, M.D., & a.

January 24, 1983

40

*Nadeau Professional Offices*, of Rye (*J. P. Nadeau* on the brief and orally), for the plaintiffs.

*Sulloway, Hollis & Soden*, of Concord (*Martin L. Gross* and *Amy K. Eckman* on the brief, and *Mr. Gross* orally), for the defendants.

*Thomas P. Colantuono*, of Derry, by brief for the Unauthorized Practice of Law Committee, New Hampshire Bar Association, as amicus curiae.

DOUGLAS, J. This medical-malpractice action presents the issue whether private plaintiffs have an unconditional right to have an acknowledged expert in the field of medical jurisprudence act as legal counsel in their civil suit. We hold that the medical expert in this case may properly be excluded from acting as the plaintiffs' legal representative in order to prevent him from engaging in the unauthorized practice of law. We vacate the orders of the court below and remand for proceedings in light of this opinion.

The plaintiff Mary K. Bilodeau brought this wrongful death action as administratrix of the estate of her deceased husband, Donat Bilodeau, and individually for loss of consortium. The writ alleges malpractice on the part of the defendants, Dr. Richard Antal and Dr. Jeremy Handelman. The writ was signed by Attorney J. P. Nadeau and was filed in the Rockingham County Superior Court on November 3, 1981. On the same day, Mrs. Bilodeau, in her individual capacity, filed with the court a power of attorney, appointing Dr.

Glenn W. Bricker as her attorney-in-fact to represent her in the loss-of-consortium claim. Dr. Bricker is a medical expert with substantial experience in medical malpractice litigation. Dr. Bricker, who has not been admitted to the practice of law in any state, then entered an appearance on behalf of Mrs. Bilodeau.

On November 4, 1981, a hearing was held on Attorney Nadeau's motion to have Dr. Bricker join him as co-counsel "for the sole and limited purpose of examination and cross-examination of medical expert witnesses." The Superior Court (*Wyman*, J.) denied the motion, ruling that under RSA 311:1 and Superior Court Rule 14, a party may be represented by a lawyer or a nonlawyer, but not both.

Shortly thereafter, Attorney Nadeau withdrew as counsel for Mrs. Bilodeau individually, leaving Dr. Bricker to act as her sole legal representative in the loss-of-consortium action. Anita Holt, the decedent's daughter, was also substituted as the administratrix of the decedent's estate. Dr. Bricker proceeded to take the deposition of Dr. Antal, purportedly in connection with Mrs. Bilodeau's individual case. The defendants then filed a motion to sever the wrongful-death action, in which Attorney Nadeau was counsel of record, and the loss-of-consortium action, in which Dr. Bricker was counsel of record. The stated purpose of the severance motion was to avoid circumvention of the trial court's earlier order.

While this motion was pending, Dr. Bricker took the depositions of a pathologist and a nurse. Over the defendants' objections, Attorney Nadeau was present at these depositions and also personally questioned the witnesses.

Dr. Antal then filed a motion for court control of discovery so that Attorney Nadeau, representing the estate, and Dr. Bricker, representing Mrs. Bilodeau individually, would not be able to attend any deposition simultaneously. The motion was also intended to enforce the trial court's original order denying joint counsel.

After a hearing on November 16, 1981, the superior court granted the motion to sever, calling the apparent separation of legal representation a "sham and subterfuge." The court informed Attorney Nadeau that it was severing the cases in order to prevent Dr. Bricker and him from participating as co-counsel in the same discovery and court proceedings:

> "You have an election . . . You have all the right in the world for your client and this estate to have this doctor as your medical expert. But you may not at the same time have him as a lawyer in the case."

Because the plaintiffs questioned the sufficiency of notice of the motion for court control of discovery, a third hearing was held, after

which the November 16, 1981, order was amended to prohibit Attorney Nadeau and Dr. Bricker from jointly attending or assisting in the preparation for depositions in these cases. The plaintiffs then appealed to this court.

The plaintiffs argue that the issue before us is whether RSA 311:1, which permits any person of good character to appear on behalf of a party, guarantees them the right to be represented simultaneously by a lawyer and a nonlawyer. They maintain that the defendants' contention, that the trial court's actions were proper to prevent Dr. Bricker from engaging in the unauthorized practice of law, is irrelevant.

To the contrary, we have taken judicial notice in the past that Dr. Bricker is "a recognized expert in the field of legal medicine." *Guarracino v. Beaudrey*, 118 N.H. 435, 437, 387 A.2d 1163, 1165 (1978). He has appeared as a medical expert in numerous cases that have come before this court. Significantly, in a letter to Attorney Nadeau dated November 17, 1981, which is part of the record of this case, Dr. Bricker stated that he consulted another lawyer to seek his advice about the idea of becoming co-counsel for the limited purpose of examining and cross-examining medical expert witnesses. Dr. Bricker wrote:

> "He thought your idea was excellent and said if things went well in your case he would like me to assist him in the same way. . . . I called a few of the lawyers for whom I am presently doing work and as a result of my discussions with them I found that they too liked your idea."

From this letter it is apparent that Dr. Bricker proposed that this case could be only the pilot ship of many medical-malpractice cases in which he would act as co-counsel, albeit in a limited capacity.

Moreover, RSA 311:1 cannot be read in isolation, but must be read in conjunction with other statutory provisions, court rules, case law, and the Code of Professional Responsibility, all addressed to the unauthorized practice of law. RSA 311:1 provides: "A party in any cause or proceeding may appear, plead, prosecute or defend, in his proper person or by any citizen of good character." Enacted at the same time as that statute, however, was RSA 311:7, which provides: "No person shall be permitted *commonly* to practice as an attorney in court unless he has been admitted by the court and taken the [statutory] oath . . . ." (Emphasis added.) Any person who is eighteen years old and "of good moral character and suitable qualifications" as determined by this court may be admitted to practice law in the State of New Hampshire. RSA 311:2 (Supp. 1981).

This court has established the following criteria for demonstrating suitable qualifications: graduation from a law school accredited by the American Bar Association; successful passage of the Multistate and State Bar examinations, as well as the Multistate Professional Responsibility Examination; certification of good moral character and fitness by this court's Standing Committee on Character and Fitness; and residency within the State. N.H. SUP. CT. R. 42. Upon admission, all new lawyers must become members of the New Hampshire Bar Association and must attend a practical skills course to "assist new lawyers in developing basic lawyering skills and practical knowledge." N.H. SUP. Ct. R. 42(7)(a). Furthermore, in order to strengthen enforcement, the legislature enacted RSA 311:7-a to :7-f (Supp. 1981), granting the attorney general's office broad investigative powers to pursue any complaint of the unauthorized practice of law. *See* N.H. JUDICIAL COUNCIL, FOURTEENTH REPORT 32 (1966).

The strong public policy against the unauthorized practice of law is embodied in the American Bar Association Code of Professional Responsibility, which this court formally adopted as the New Hampshire Code of Professional Responsibility on April 26, 1977. Disciplinary Rule 3-101(A) of the Code prohibits a lawyer from aiding a nonlawyer in the unauthorized practice of law. This rule reflects the ethical considerations listed under Canon 3, which are aimed at protecting the public against unqualified individuals rendering legal services. For instance, EC 3-1 provides:

> "The prohibition against the practice of law by a layman is grounded in the need of the public for integrity and competence of those who undertake to render legal services. Because of the fiduciary and personal character of the lawyer-client relationship and the inherently complex nature of our legal system, the public can better be assured of the requisite responsibility and competence if the practice of law is confined to those who are subject to the requirements and regulations imposed upon members of the legal profession."

This concern for protecting the public interest is further reflected in DR 6-101(A)(1), which subjects to discipline any lawyer who undertakes a legal matter which he is incompetent to handle, without associating with a lawyer who is competent to handle the case.

This court on numerous occasions has stated that more than just proof of good moral character is necessary before a person will be allowed to engage in the practice of law on a regular basis. In *Bryant's Case*, 24 N.H. 149 (1851), we stated:

> "Mere certificates of good moral character, which can so readily be procured by any one [sic] who has not been convicted of an offence [sic], cannot supply the want of study, of reflection, and of that intellectual training, which, among a people so intelligent as ours, can alone render persons competent to take charge of litigated cases in court, involving as they do the life, liberty, reputation and property of so many of their fellow citizens."

*Id.* at 153. Nearly forty years later, in *Ricker's Petition*, 66 N.H. 207, 29 A. 559 (1890), we discussed the distinction between the occasional representation of a party by a lay person and the frequent appearance of a nonlawyer in a legal capacity:

> "Justice requires that a party should be permitted to conduct his cause in person . . . or by any agent of good character. . . . But no one should commonly practise [sic] as an attorney without the mental and moral qualifications for a business in which his unfitness would naturally bring disaster upon his employers and himself."

*Id.* at 225–26, 29 A. at 568. *See In re Unification of the New Hampshire Bar*, 109 N.H. 260, 265, 248 A.2d 709, 713 (1968).

Other jurisdictions have found that statutes permitting a person of good moral character to prosecute cases do not allow nonlawyers to engage in the *general* practice of law, but only apply to isolated instances of legal representation. *See, e.g., Graustein v. Barry*, 315 Mass. 518, 520–21, 53 N.E.2d 568, 569–70 (1944) (unlicensed layman who had prosecuted 277 cases in twenty-five years held to be engaged in unauthorized practice of law); *State ex rel. Frieson v. Isner*, 285 S.E.2d 641, 650 (W. Va. 1981) (collection agency which frequently filed complaints in small-claims court on behalf of creditors was engaged in unauthorized practice of law). These cases relied upon the public policy of regulating the practice of law in the public interest.

■■ It is clear that the legislature, when it enacted RSA 311:1 and its predecessors, did not intend to give nonlawyers free rein to practice law in circumvention of other statutory restrictions and of the powers delegated to this court to regulate the practice of law in the courts of this State. *See* RSA 490:4 (Supp. 1979). Our holding turns upon a statutory interpretation of the provisions of RSA chapter 311. A statute must be read as a whole and all of its sections considered together. *Blue Mountain Forest Ass'n v. Town of Croydon*, 119 N.H. 202, 204, 400 A.2d 55, 57 (1979); *Arthur Lessard & Sons v. Kakides*, 116 N.H. 50, 51, 351 A.2d 61, 62 (1976).

■ ■ RSA 311:1 does not guarantee the plaintiffs the right to have Dr. Bricker represent either or both of them under all circumstances, either as sole counsel or as co-counsel. The trial court may properly act to prevent a person, such as Dr. Bricker, from acting "commonly" as legal counsel when it reasonably appears, as in this case, that to do otherwise would be to sanction the unauthorized practice of law. RSA 311:7.

■ Our holding today does not involve the situation in which a nonlawyer might appear once as a representative of a party. Nor do we mean to suggest that there is any single factor to determine whether someone is engaged in the unauthorized practice of law and, consequently, may be prohibited from undertaking the legal representation of another. That determination must be made on a case-by-case basis. For instance, compensation may be evidence of the regular practice of law, but the absence of compensation is not alone dispositive that an individual is not practicing law. Additionally, we reaffirm the right of law enforcement officers to *prosecute* criminal cases on behalf of the State, *see State v. Aberizk*, 115 N.H. 535, 535, 345 A.2d 407, 408 (1975); *State v. LaPalme*, 104 N.H. 97, 98, 179 A.2d 284, 285 (1962), but not to appear as the legal representative of a criminal defendant. *See* RSA 104:25.

■ The assistance of a medical expert must cease when it comes to the examination and cross-examination of witnesses. Lawyers alone are uniquely knowledgeable about the procedural and evidentiary law of our State, in addition to the substantive law of the case at hand. Perhaps more important, lawyers are subject to discipline, *Nardi's Case*, 122 N.H. 277, 278, 444 A.2d 512, 513 (1982), and may be sued privately if their performance falls below the level of reasonable care and diligence. Remus, *Legal Malpractice: The New Era*, 19 N.H.B.J. 11, 15 (1977). We see no reason why trial counsel cannot refer a complex medical-malpractice case to a lawyer who is competent to handle such a case, or take the requisite time to master the medical details.

*Vacated and remanded.*

BROCK and BATCHELDER, JJ., did not sit; the others concurred.