STRAFFORD.

## RICKER'S PETITION.

A woman may be an attorney-at-law. In a limited sense, a member of the bar is an officer of the court; but in the work of his profession he does not take an official part in the government of the state, for which women are disqualified by the common law.

PETITION, of Marilla M. Ricker, widow, to be admitted to practice as an attorney.

*Lelia J. Robinson*, for the petitioner, and *M. M. Ricker, pro se.*

[Copy of the statute.]

"Sect. 1. A party in any cause or proceeding may appear, plead, prosecute, or defend, in his proper person or by any citizen of good character.

"Sect. 2. Any citizen of the age of twenty-one years, of good moral character and suitable qualifications, on application to the supreme court, shall be admitted to practice as an attorney.

"Sect. 3. Any person who has been admitted to practice as an attorney or counsellor of the highest judicial court of another state of which he was then an inhabitant, may be admitted to practice as an attorney in this state upon satisfactory evidence of his good moral character, without examination concerning his other suitable qualifications, when such examination is rendered unnecessary by the circumstances of the case. . . .

"Sect. 5. Every attorney admitted to practice shall take and subscribe, in open court, the oaths to support the constitution of this state and of the United States, and the oath of office," one of the clauses of which is "that you . . . will act in the office of an attorney within the court according to the best of your learning and discretion, and with all good fidelity as well to the court as your client. . . .

"Sect. 6. No person shall be permitted commonly to practice as an attorney in court unless he has been admitted by the court, and taken the oath aforesaid.

"Sect. 7. The court shall inquire in a summary manner into any charge of fraud, malpractice, or contempt of court, against an attorney, and upon satisfactory evidence of his guilt shall suspend him from practice or may remove him from office." G. L., c. 218; Laws 1883, c. 33.

DOE, C. J.   "Any citizen of the age of twenty-one years, of good moral character and suitable qualifications, on application to the supreme court, shall be admitted to practice as an attorney." G. L., c. 218, s. 2.   "The word 'citizen,' when used in its most common and most comprehensive sense, doubtless includes women; but a woman is not, by virtue of her citizenship, vested by the constitution   .   .   .   with any absolute right, independent of legislation, to take part in the government, either as a voter or as an officer, or to be admitted to practice as an attorney.   .   .   .   The word 'citizen,' in the statute under which this application is made, is but a repetition of the word originally adopted with a view of excluding aliens." *Robinson's Case*, 131 Mass. 376, 377, 382. Under a statute like ours in all respects that are material in the present inquiry, it was held in that case that an unmarried woman is not entitled to be examined for admission as an attorney.   The ground of the decision was, that by the law of England, which was our law from the first settlement of the country until the American Revolution, no woman could, in person, take an official part in the government of the state, except as queen or overseer of the poor, without express authority of statute : no case is known in which a woman was admitted to practice as an attorney, solicitor, or barrister: although an attorney-at-law is not, in the strictest sense, a public officer, he comes very near it: he is required to take the oaths to support the constitutions, and an oath of office, which has remained without substantial change since the time of Lord Holt: by admission he becomes an officer of the court, and holds his office during good behavior, subject to removal : his office concerns the public, for it is for the administration of justice : whenever the legislature has intended to make a change in the legal rights or capacities of women, it has used words clearly manifesting its intent and the extent of the change intended : in making innovations upon the long established system of law on this subject, the legislature has proceeded with great caution, one step at a time : the whole course of legislation precludes the inference that any change in the legal rights or capacities of women is to be implied, which has not been clearly expressed : there has been no legislative or judicial action having any tendency to prove such a change in the law and usage prevailing in 1776 as to admit women to the exercise of any office that concerns the administration of justice.   This ground of decision was adopted in *Leonard's Case*, 12 Oreg. 93.

The same conclusion was reached in *Bradwell's Case*, 55 Ill. 535, 537–541, where it was held that authority to license attorneys was derived from a statute.   "Although an attorney-at-law," say the court, "is an agent   .   .   .   when he has been retained to act for another, yet he is also much more than an agent.   He is an officer of the court, holding his commission, in this state, from two members of this court, and subject to be disbarred by this

court for what our statute calls 'mal-conduct in his office.' He is appointed to assist in the administration of justice, is required to take an oath of office, and is privileged from arrest while attending courts. . . . At the time this statute was enacted, we had, by express provision, adopted the common law of England. . . . Female attorneys-at-law were unknown in England. . . . When the legislature gave to this court the power of granting licenses to practise law, it was with not the slightest expectation that this privilege would be extended equally to men and women. . . . This step, if taken by us, would mean that in the opinion of this tribunal every civil office in this state may be filled by women. . . . The great body of our law rests on ancient usage. . . . The mere fact that women have never been licensed as attorneys-at-law, is, in a tribunal where immemorial usage is as much respected as it is and ought to be in courts of justice, a sufficient reason for declining to exercise our discretion in their favor, until the propriety of their participating in the offices of state and the administration of public affairs shall have been recognized by the law-making department of the government. . . . If we could disregard in this matter the authority of those unwritten usages which make the great body of our law, we might do so in any other, and the dearest rights of person and property would become a matter of mere judicial discretion."

In *Goodell's Case*, 39 Wis. 232, it was held that the statute left the admission of attorneys to the discretion of the court, and a motion to admit Miss Goodell was denied on the ground that it is public policy not to tempt women from the proper duties of their sex by opening to them duties peculiar to ours: the practice of the law, like military service, is not one of the many employments that are fit for women: discussions are habitually necessary in courts of justice which are unfit for female ears: the habitual presence of women at these would tend to relax the public sense of decency and propriety. "If these things are to come," say the court, "we will take no voluntary part in bringing them about."

In *Lockwood's Case*, 9 Ct. Cl. 346, it was held that admission to the bar is admission to an office which a woman is without legal capacity to hold; and the opinion was expressed that women are as well fitted for military service as for the practice of law. "In cases of misconduct by an attorney," it was said (*p.* 353), he may be attached by the court, and imprisoned; but if the attorney were a married woman, she might come in and say that the misconduct occurred in her husband's presence, and that at common law it was by his compulsion. She might misapply the funds of a client, or be guilty of gross neglect or fraud, and the husband be sued at common law for the wrong." In *Hall's Case*, 50 Conn. 131, the construction given to a statute, by a majority of the court, allowed women to be admitted to the bar. Upon reënactments of an old statute, general compilations and revisions, and circumstan-

tial evidence, contextual and extraneous, it seems to have been held that the legislature had changed the law.

The common-law disabilities of a married woman, whose legal existence, for some purposes and to some extent, was merged in that of her husband, may have made it inexpedient that she should be a member of the legal profession. Her application for admission might formerly have been denied on the ground that she "would be bound neither by her express contracts nor by those implied contracts which it is the policy of the law to create between attorney and client." *Bradwell's Case*, 55 Ill. 535, 536; *Alton* v. *Gilmanton*, 2 N. H. 520; *Leighton* v. *Sargent*, 27 N. H. 460, 468–472; *Towle* v. *Hatch*, 43 N. H. 270; *Varnum* v. *Martin*, 15 Pick. 440; *Tarbell* v. *Dickinson*, 3 Cush. 345, 350, 351. A form of a declaration in assumpsit against an attorney is, "For that whereas . . . in consideration that the plaintiff . . . had then retained and employed the defendant, as then being an attorney, to prosecute and conduct a certain action, . . . for reasonable fees and reward, to be paid by the plaintiff to the defendant, he, the defendant, then promised the plaintiff to use due and proper care and skill; . . . nevertheless, the defendant, not regarding his said promise, did not, nor would, use due and proper care and skill." 1 Saund. Pl. & Ev. 268. A married woman who could defeat such a suit by pleading and proving her coverture at the time of making the contract, might not be a competent attorney. In this state, legal disabilities have been so far removed that marriage does not disqualify a woman for admission to the bar. G. L., c. 183, s. 12; Laws 1879, c. 57, s. 27; *Harris* v. *Webster*, 58 N. H. 481, 483, 484; *Laton* v. *Balcom*, 64 N. H. 92, 95; *Seaver* v. *Adams*, *ante*, *pp.* 142, 143. "An act of parliament cannot alter by reason of time; but the common law may, since *cessante ratione cessat lex.*" Pott. Dwarris 122; *Cole* v. *Lake Co.*, 54 N. H. 242, 285.

"The constitution . . . vests in the courts all the judicial power of the state. The constitutional establishment of such courts appears to carry with it the power to establish a bar to practice in them. And admission to the bar appears to be a judicial power. It may, therefore, become a very grave question for adjudication here, whether the constitution does not entrust the rule of admission to the bar, as well as of expulsion from it, exclusively to the discretion of the courts." *Goodell's Case*, 39 Wis. 232, 239; *Splane's Case*, 123 Pa. St. 527, 540. The constitutional question need not now be considered. If our statute of attorneys is an exercise of legislative power, it makes no change in the common law applicable to this case. It removes none of the legal disabilities of women, and destroys none of their rights. 54 N. H. 619, 626, 635, 636. If its provisions are not operative as a statute, they have nevertheless been acquiesced in and acted upon, and may well be regarded as having the force of rules of court, for the adoption of which a written order is not necessary. *Fullerton* v. *Bank*, 1 Pet. 604, 613;

*Duncan* v. *U. S.*, 7 Pet. 435, 451. Independently of any statute, every court of record may make such rules for the transaction of its business as do not contravene the laws of the land.  Bac. Abr. (Am. ed., 1868) Courts of U. S. (C).  The power is incidental, that is, implied as a means of accomplishing the purpose for which the court is established.  64 N. H. 177.  The provision that " The court may from time to time establish rules and orders of practice, consistent with the laws, for conducting and regulating its business, and prescribe forms of proceedings in all cases not provided for " (G. L., *c.* 208, *s.* 6), is an enactment of common law.  In the absence of written law establishing a different state of things, authority to make reasonable rules for the admission and removal of members of the bar " is necessarily inherent in every court, in order to enable it to discharge its duties, as much so as the power to preserve order."  *Bryant's Case*, 24 N. H. 149, 158; *Manning* v. *French*, 149 Mass. 391, 398, 399; *State* v. *Winton*, 11 Oreg. 456, 460; *Ex parte Burr*, 9 Wheat. 529, 531; *Griffin* v. *Thompson*, 2 How. 244, 257; 3 B. & Ad. 770, 777, 782.  "The relations between the court and the attorneys and counsellors who practise in it, and their respective rights and duties, are regulated by the common law.  And it has been well settled, by the rules and practice of common-law courts, that it rests exclusively with the court to determine who is qualified to become one of its officers, as an attorney and counsellor, and for what cause he ought to be removed."  *Secombe's Case*, 19 How. 9, 13.

"The profession of an attorney and counsellor is not like an office created by an act of congress, which depends for its continuance, its powers, and its emoluments upon the will of its creator, and the possession of which may be burdened with any conditions not prohibited by the constitution.  Attorneys and counsellors are not officers of the United States; they are not elected or appointed in the manner prescribed by the constitution for the election and appointment of such officers.  They are officers of the court, admitted as such by its order, upon evidence of their possessing sufficient legal learning and fair private character. . . .  The order of admission is the judgment of the court that the parties possess the requisite qualifications as attorneys and counsellors, and are entitled to appear as such and conduct causes therein.  From its entry the parties become officers of the court, and are responsible to it for professional misconduct.  They hold their office during good behavior, and can only be deprived of it for misconduct ascertained and declared by the judgment of the court after opportunity to be heard has been afforded.  Their admission or their exclusion . . . is the exercise of judicial power. . . .  The legislature may undoubtedly prescribe qualifications for the office . . . as it may . . . prescribe qualifications for the pursuit of any of the ordinary avocations of life."  *Ex parte Garland*, 4 Wall. 333, 378, 379.

"The court, in some instances, will order an attorney to pay costs to his own client for neglect, or to the opposite party for vexatious or improper conduct. And if a rule be made upon an attorney for the delivery of writings, or payment of costs, etc., and it be not obeyed; the court will enforce it by attachment." 1 Tidd Pr. 58. "At common law an attorney was always liable to be dealt with in a summary way for any ill practice attended with fraud or corruption, and committed against the obvious rules of justice and honesty. No complaint, indictment, or information was ever necessary as the foundation of such proceedings. Usually they are commenced by rule to show cause, or by an attachment or summons to answer; but these are issued on motion or bare suggestion to the court, or even on the knowledge which the court may acquire of the doings of an attorney by their own observation. No formal or technical description of the act complained of is deemed requisite to the validity of such a proceeding. Sometimes they are founded on affidavit of the facts, to which the attorney is summoned to answer; in other cases, by an order to show cause why he should not be stricken from the roll; and when the court judicially know of the misconduct of an attorney, they will of their own motion order an inquiry to be made by a master without issuing any process whatever. . . . Nor can a judgment of removal be properly . . . considered as a punishment for a crime or offence." It is not a bar to a criminal prosecution. The power of removal is necessary, "not as a mode of inflicting a punishment for an offence, but in order to enable the courts to prevent the scandal and reproach which would be occasioned to the administration of the law by the continuance in office of those who had violated their oaths or abused their trust, and to take away from such persons the power and opportunity of injuring others by further acts of misconduct and malpractice." *Randall's Petition*, 11 Allen 473, 479, 480; *Randall* v. *Brigham*, 7 Wall. 523, 539, 540; *Kimball's Case*, 64 Me. 140, 147; *Austin's Case*, 5 Rawle 191, 204; *State* v. *Winton*, 11 Oreg. 456, 466; *Cohen* v. *Wright*, 22 Cal. 293, 320. The question tried in such a case is, "whether, after the conduct of this man, it is proper that he should continue a member of a profession which should stand free from all suspicion," whether "he is an unfit person to practise as an attorney." *Brounsall's Case*, Cowp. 829, 830. The issue of fitness for the office of an attorney is as general and comprehensive as the question raised by a petition to the legislature for the removal of a military or judicial officer by address. An adjournment of the hearing after adverse evidence is received, gives an opportunity for defence as ample as would be furnished by a formal specification of charges filed before the hearing begins. As attorneys are peculiarly exposed to groundless accusations, and may suffer irreparable injury from a public trial of the question of removal on an order to show cause, even if it ends in their complete vindication

(4 Camp. Ch. Jus. 136, 137), such an order is not made unless manifestly required by the public interest. *Meux* v. *Lloyd*, 2 C. B. N. S. 409, 411.

"Barristers or counsellors-at-law, in England, were never appointed by the courts at Westminster, but were called to the bar by the inns of court." *Cooper's Case*, 22 N. Y. 67, 90. "The original institution of the inns of court nowhere precisely appears, but it is certain that they are not corporations, and have no constitution by charter from the crown. They are voluntary societies, which for ages have submitted to government analogous to that of other seminaries of learning. But all the power they have concerning the admission to the bar is delegated to them from the judges, and in every instance their conduct is subject to their control as visitors." *King* v. *Benchers of Gray's Inn*, 1 Doug. 353, 354. That case was an application for a mandamus to compel the defendants to call the petitioner, Hart, to the degree of a barrister-at-law. A mandamus was refused on the ground that the ancient and usual way of redress was by appeal to the twelve judges as visitors. The power of admission, inherent in courts, having been immemorially exercised by the inns, with the assent of the judges and subject to their revision, its qualified delegation could be inferred from the circumstances. No one is called to the bar who is not a member of an inn. On the question of admission to an inn there is no appeal from the benchers. As visitors, the judges have jurisdiction only over actually admitted members of an inn. "This court has no power to compel the benchers of this society to permit any individual to become a member of the society, or to assign any reasons why they do not admit him." *Abbott*, C. J., in *King* v. *Benchers of Lincoln's Inn*, 4 B. & C. 855, 858. "Every individual . . . has not an inchoate right to be admitted a member of any of these societies. They make their own rules as to the admission of members; and even if they act capriciously upon the subject, this court can give no remedy in such a case, because in fact there has been no violation of any right. This case is analogous to that of a college." *Bayley*, J., in the same case.

When "the fixing of the court of common pleas, the grand tribunal for disputes of property, to be held in one certain spot," brought the legal profession together, "they naturally fell into a kind of collegiate order, and, being excluded from Oxford and Cambridge, found it necessary to establish a new university of their own. This they did by purchasing at various times certain houses (now called the inns of court and of chancery). . . . Here exercises were performed, lectures read, and degrees were at length conferred in the common law, as at other universities in the canon and civil. The degrees were those of barristers (first styled apprentices . . .) who answered to our bachelors: as the state and degree of a serjeant . . . did to that of doctor." 1 Bl. Com. 22, 23.

"Of advocates, or (as we generally call them) counsel, there are two species or degrees; barristers and serjeants. The former are admitted after a considerable period of study, or at least standing, in the inns of court. . . . From both these degrees some are usually selected to be his majesty's counsel learned in the law. . . . These king's counsel . . . must not be employed in any cause against the crown without special license. . . . A custom has of late years prevailed of granting letters-patent of precedence to such barristers as the crown thinks proper to honor with that mark of distinction: whereby they are entitled to such rank and pre-audience as are assigned in their respective patents; sometimes next after the king's attorney-general, but usually next after his majesty's counsel then being. These . . . rank promiscuously with the king's counsel, and together with them sit within the bar of the respective courts; but receive no salaries, and are not sworn, and therefore are at liberty to be retained in causes against the crown. And all other serjeants and barristers indiscriminately (except in the court of common pleas, where only serjeants are admitted) may take upon them the protection and defence of any suitors, whether plaintiff or defendant; who are therefore called their *clients*, like the dependants upon the ancient Roman orators. Those indeed practised *gratis*, for honor merely, or at most for the sake of gaining influence: and so likewise it is established with us that a counsel can maintain no action for his fees; which are given, not as *locatio vel conductio*, but as *quiddam honorarium;* not as a salary or hire, but as a mere gratuity. . . . Counsel guilty of deceit or collusion are punishable by the statute Westm. 1, 3 Edw. I, *c.* 28, with imprisonment for a year and a day, and perpetual silence in the courts." 3 Bl. Com. 26–29. This statute did not impair the common-law power of disbarment delegated by the courts to the inns to which the members of the bar respectively belong, and exercised by them subject to the appellate jurisdiction of the visitors from whom the power was derived.

"We are told that in the reign of Henry VI there were ten lesser inns, which were called *inns of chancery*, each containing at least one hundred students, and some a great many more. These were designed as places of elementary studies : here they learned the nature of original and judicial writs, which were then considered as the first principles of the law: and for this reason these inns were denominated from the chancery. When young men had made some progress here, and were more advanced in years, then they were admitted into the *inns of court*. Of these there were four in number. . . . The degree of serjeant-at-law was considered in a very respectable light: none could be a judge in the king's bench or common pleas but one who had been first a serjeant; nor was a person to be called to the degree of serjeant till he had been in the general study of the law . . . at least

for sixteen years, which probably meant from his first entrance at an inn of chancery." 4 Reeve Eng. Law 120, 121, ed. of 1787.

" Barristers, in England, are the highest class of lawyers who have exclusive audience in all the superior courts. Every barrister must be a member of one of the four ancient societies called inns of court, viz., Lincoln's Inn, the Inner and Middle Temples, and Gray's Inn. . . . Associations of lawyers acquired houses of their own in which students were educated in the common law. . . . These schools of law are now represented by the inns of court, which still enjoy the exclusive privilege of calling to the bar, and through their superior order of *benchers* control the discipline of the profession. . . . Subject to an appeal to the common-law judges as visitors, they may reject the petition of a student to be called to the bar, or expel from their society and from the profession any barrister or bencher of the inn. . . . The peculiar business of barristers is the advocacy of causes in open court, but . . . a great deal of other business falls into their hands. They are the chief conveyancers, and the pleadings . . . are in all but the simplest cases drafted by them. There is indeed a separate class of *conveyancers* and *special pleaders*, being persons who have kept the necessary number of terms qualifying for a call, but who, instead of being called, take out licenses to practise *under the bar*. There are still a few persons who act under such special licenses, but in general conveyancing and special pleading form part of the ordinary work of a junior barrister. The highest rank among barristers is that of king's or queen's counsel. They lead the case in court, and give opinions on cases submitted to them, but they do not accept conveyancing or pleading, nor do they admit pupils to their chambers. Precedence among queen's counsel, as well as among outer barristers, is determined by seniority. The order of sergeants-at-law still exists, but no new appointments have recently been made, and it will probably be allowed to become extinct, the title of queen's counsel being generally preferred. Sergeants rank after queen's counsel. . . . Barristers cannot maintain an action for their fees, which are regarded as gratuities, nor can they, by the usage of the profession, undertake a case without the intervention of an attorney." 3 Enc. Brit. 394, 395.

"There certainly has been an understanding in the profession that a barrister ought not to accept a brief in a civil suit, except from an attorney. . . . But . . . there is no rule of law by which it can be enforced. . . . This being a matter of procedure, the judges . . . might . . . have laid down a general rule . . . : but no such rule is to be found." *Doe* v. *Hale*, 15 A. & E. N. S. 171, 182, 183, 225. In early times, personal communication between counsel and client " was necessary; for there were no attorneys. . . . It was not until after the statutes of Merton (20 H. III, *c.* 10), Westminster (3 E. I, *c.* 33),

and Gloucester (6 E. I, c. 1), that suitors were allowed to appear at pleasure by attorney. The counsellor was for many centuries the only person known as a 'lawyer.'" Argument of counsel in *Kennedy* v. *Broun*, 13 C. B. N. S. 677, 698.

"It has been understood in this country that the fees of a physician are honorary, and not demandable of right." *Chorley* v. *Bolcot*, 4 D. & E. 317, 318. "Physicians and counsel usually perform their duties without having a legal title to remuneration. Such has been the general understanding." *Veitch* v. *Russell*, 3 A. & E. N. S. 928, 936. "Attorneys are responsible to their clients for negligence or unskilfulness; but no action lies against the counsel for his acts, if done *bona fide* for his client. In this respect, therefore, the counsel stands in a different position from the attorney." *Swinfen* v. *Swinfen*, 1 C. B. N. S. 364, 403. "An advocate at the English bar, accepting a brief in the usual way, undertakes a duty, but does not enter into any contract or promise, express or implied. Cases may indeed occur where on an express promise (if he made one) he would be liable in assumpsit; but we think a barrister is to be considered, not as making a contract with his client, but as taking upon himself an office or duty, in the proper discharge of which not merely the client, but the court in which the duty is to be performed, and the public at large, have an interest. . . . A counsel has complete authority over the suit, the mode of conducting it, and all that is incident to it. . . . No action will lie against counsel for any act honestly done in the conduct or management of the cause." *Swinfen* v. *Chelmsford*, 5 H. & N. 890, 920, 922, 923. "A promise by a client to pay money to a counsel for his advocacy, whether made before, or during, or after the litigation, has no binding effect; . . . the relation of counsel and client renders the parties mutually incapable of making any contract of hiring and service concerning advocacy in litigation. . . . If the authorities were doubtful, and it was necessary to resort to principle, the same proposition appears to us to be founded on good reason. . . . The incapacity of the advocate in litigation to make a contract of hiring affects the integrity and dignity of advocates, and so is in close relation with the highest of human interests, viz., the administration of justice." *Kennedy* v. *Broun*, 13 C. B. N. S. 677, 727, 736, 737. "I cannot allow that the counsel is the agent of the party." *Best*, C. J., in *Colledge* v. *Horn*, 3 Bing. 119, 120; *Pollock*, C. B., in *Swinfen* v. *Chelmsford*, 5 H. & N. 890, 907.

"In hearing motions, the course formerly was, to begin every day with the senior counsel within the bar, and then to call to the next senior in order, and so on; . . . and to proceed again in the same manner upon the next and every subsequent day, although the bar had not been half, or perhaps a quarter, gone through upon any one of the former days; so that the juniors were very often obliged to attend in vain, without being able to bring on

their motions, for many successive days. This practice bearing hard upon junior counsel, Lord *Mansfield* introduced a different rule." 1 Tidd Pr. 461.

" The most valuable privilege formerly enjoyed by the serjeants (who, besides the judges, were limited to fifteen in number) was the monopoly of the practice in the court of common pleas." 3 Bl. Com. 27, Sharswood's note. In 1834, the king, by warrant, ordered that the right of practising, pleading, and audience in the common pleas should cease to be exercised exclusively by the serjeants, and that all barristers should have equal right in that court with the serjeants. 10 Bing. 571. The order was obeyed till 1839, when, on motion made by Wilde, in behalf of four other serjeants and himself, the exclusive privilege of the serjeants was restored, on the ground that it was a legal right of which they could not be deprived without an act of parliament. Wilde contended that " The rank and office of serjeant were as ancient, and rested on the same foundation, as those held by their lordships; there was no evidence of the existence of the court without them; they were as ancient as the law itself." Newton, an apprentice (a barrister not raised to the degree of serjeant), was heard on the other side. " The learned serjeant," he said, " had contended that the crown had no power to issue a warrant which interfered with the privileges of the serjeants. By what authority, then, was it that these learned gentlemen claimed to be entitled to those privileges? By virtue of the royal" writ " by which they were raised to the degree of the coif. . . . They derived their appointment from the supreme executive power; and the same authority had an equal right to empower other members of the bar to enjoy equal privileges. The royal warrant was of as much force in authorizing barristers to practise in this court as the royal writ which constituted certain members of the profession serjeants-at-law."

" The antiquity of the state, degree, and office of a serjeant-at law," says *Tindal*, C. J., delivering the opinion of the court, " is as high, at the least, as the existence of the court itself. . . . They are called to the state and degree of serjeant *by writ:* which of itself is a strong argument of the antiquity of their office. . . . By their oath of office, which has existed from the earliest time— an oath by which no other barrister is bound to give attendance in any particular court—they bind themselves ' to give due attendance for the service of the king's people in their causes.' As early as any authentic records exist, the serjeants are found to be practising in the court of common pleas; and there is no evidence of any other barrister being allowed to practise . . . in that court. . . . From time immemorial, the serjeants have enjoyed the exclusive privilege of practising, pleading, and audience in the court of common pleas. Immemorial enjoyment is the most solid of all titles. . . . The warrant of the crown can no more

deprive the serjeant, who holds an immemorial office, of the bene-
fits and privileges which belong to it, than it could alter the admin-
istration of the law within the court itself. The rights and privi-
leges of the serjeant, and the rights and privileges of the peer of
the realm, stand upon the same foundation, immemorial usage.".
6 Bing. N. C. 187, 195, 232, 235. "The degree of serjeant was
deprived of its most profitable . . . advantage (exclusive
audience in the court of common pleas) by the statute of 9 & 10
Vict., *c.* 54, which extends to all barristers the privileges of ser-
jeants in " that court. 3 Bl. Com. 27, Stewart's note.

English attorneys-at-law (called solicitors since the judicature
act of 1873 took effect) are not members of the bar, and are not
heard in the superior courts, and the power of admitting them to
practice and striking them off the roll has not been given to the
inns of court. "That part of the profession which is carried on
by attornies is liberal and reputable, as well as useful to the pub-
lic, . . . and they ought to be protected where they act to
the best of their skill and knowledge. But every man is liable to
error. . . . A counsel may mistake, as well as an attorney.
Yet no one will say that a counsel who has been mistaken shall be
charged with the debt. The counsel, indeed, is honorary in his
advice, and does not *demand* a fee : the attorney may *demand* a
compensation, but neither of them ought to be charged with the
debt for a mistake." *Pitt* v. *Yalden,* 4 Burr. 2,060, 2,061. "An
attorney is supposed to be always present in court : and on that
account has many privileges belonging to him in common with the
other officers of the court. Where an attorney is plaintiff, he is
entitled to sue in his own court, by attachment of privilege ; and
may lay the venue in Middlesex. Where he is defendant, he must
be sued in his own court by bill, even as acceptor of a bill of
exchange ; and cannot be arrested or holden to special bail. . . .
An attorney is also, by reason of the supposed necessity of his
attendance in court, exempt from all offices that require personal
service : . . . and formerly he was not liable to serve in the
militia. . . . These privileges are allowed, not so much for
the benefit of attornies, as of their clients ; and are therefore con-
fined to attornies who practise, or at least have practised within a,
year." 1 Tidd Pr. 264–266.

"An attorney-at-law . . . is one who is put in the place,
stead, or *turn* of another, to manage his matters of law. Formerly
every suitor was obliged to appear in person, to prosecute or
defend his suit, . . . unless by special license under the king's
letters-patent. . . . But . . . it is now permitted in gen-
eral, by divers ancient statutes, whereof the first is statute Westm.
3, *c.* 10, that attorneys may be made to prosecute or defend any
action. . . . These attorneys are now formed into a regular
corps ; they are admitted to the execution of their office by the
superior courts of Westminster Hall, and are in all points officers

of the respective courts of which they are admitted. . . . No man can practise as an attorney in any of those courts, but such as is admitted and sworn an attorney of that particular court: an attorney of the court of king's bench cannot practise in the court of common pleas ; nor *vice versa.*  To practise in the court of chancery, it is also necessary to be admitted a solicitor therein." 3 Bl. Com. 25, 26.

"Attorney, in English law, signifies, in its widest sense, any substitute or agent appointed to act in 'the turn, stead, or place of another.'  The term is now commonly confined to a class of qualified agents who undertake the conduct of legal proceedings for their clients.  By the common law the actual presence of the parties to a suit was considered indispensable, but the privilege of appearing by attorney was conceded in certain cases by special dispensation, until the statute of Merton and subsequent enactments made it competent for both parties in all judicial proceedings to appear by attorney.  Solicitors appear to have been at first distinguished from attorneys, as not having the attorney's power to bind their principles, but latterly the distinction has been between attorneys as the agents formally appointed in actions at law, and solicitors who take care of proceedings in parliament, chancery, privy council, etc.  In practice, however, and in ordinary language, the terms are synonymous. . . . The qualifications necessary for admission on the rolls of attorneys and solicitors " are fixed by statute.  "They may act as advocates in certain of the inferior courts.  Conveyancing, formerly considered the exclusive business of the bar, is now often performed by attorneys.  Barristers are understood to require the intervention of an attorney in all cases that come before them professionally, although in criminal cases the prisoner not unfrequently engages a counsel directly by giving him a fee in open court."  3 Enc. Brit. 62.

" The court by common law had no power to admit an attorney . . . to practice. . . . It was the policy of the common law, in order that suits might not multiply and increase, that both plaintiff and defendant should appear in person. . . . While the justices could not permit a person to appear by attorney, the king, by the plenitude of his prerogative, might appoint an attorney, and give any person a right to appear in this manner : letters-patent would issue out of chancery, or under the privy seal, commanding the justices to admit such and such a person as attorney for another, in regard to the particular suit in question. . . . Such an attorney was simply an attorney in fact. . . . The power of clients to appoint attorneys was conferred in England by statute Westm. 2 (3 Ed. I, *c.* 42), in certain cases.  The object of this legislation was to confer the right to appear by attorney without applying to the king. . . . In those cases to which the statute and succeeding acts did not extend, the courts were very rigid in applying the former rule. . . . The char-

acter and qualifications of an attorney were not at all involved by these statutes. He was simply an attorney in fact. Any one could, by legal principles, be an attorney. The king might send a message to the courts to receive such person as the party may name. . . . The courts say in one case (Year Book, 21 Henry VI, 30 . . .) that by the rules of law an outlaw or an attainted clerk may be an attorney in a suit, though such persons could not themselves bring actions. The reason why they could appear as attorneys was because they sued *in auter droit.* . . .

"Lord Coke tells us that the introduction of attorneys was a great and lamentable innovation upon the common law. 2 Inst. 250. The king, for a time, . . . attempted to regulate the matter. In the 20th of Edward I, he directed the justices to provide and appoint, according to their discretion, attorneys in every county. Seven score he thought enough for all England; but the justices, in their discretion, might increase the number. . . . The idea that attorneys held offices undoubtedly grew out of the limitation of their number in the ordinance of King Edward I. These measures, however, did not reach the evil. The legislature passed, in the reign of Henry IV, the model act upon this subject, and from which all subsequent legislation has derived an impress. (2 Inst. 215.) This act, after reciting in the preamble the mischiefs growing out of the former system, proceeds as follows: that all attorneys shall be examined by the justices, and that by their discretion their names shall be put upon the roll, and that they be good, virtuous, and of good fame, and be received and sworn well to serve in their offices. And the other attorneys shall be put out by the discretion of the justices, and if any of the attorneys do die, the justices shall make another in his place (4 Henry IV, c. 18). . . . Before this statute, no regulations had been made either to define the qualifications for an attorney, or to point out who should be at liberty to undertake the office. . . . This statute is very important, both for what it enacts and what it discloses. It shows that an attorney at that time held an office; that no system of testing attainments or character existed. . . . Attorneys now for the first time go on the roll; they become attorneys of record, and cease to be mere attorneys in fact. . . . Coke (in 4 Inst. 76) laments the increase of attorneys beyond the number allowed by law. . . . Several parliaments passed statutes decreasing the number of attorneys (2 Coke Inst. 250)." Argument of Theodore W. Dwight in *Cooper's Case,* 22 N. Y. 67, 68–76.

"'Attorney' is an ancient English word, and signifieth one that is set in the turn, stead, or place of another: and of these some be private, . . . and some be public, as attorneys-at-law, whose warrant from his master is, *ponit loco suo talem attornatum suum,* which setteth in his turn or place such a man to be his attorney. . . . The authority to deliver seizin . . . must be by deed:

for *letter d' attorney* is as much as a warrant of attorney by deed, for *literae* do signify sometime a deed. . . . Few persons are disabled to be private attorneys to deliver seizin; for monks, infants, fem coverts, persons attainted, outlawed, excommunicated, villeins, aliens, etc., may be attorneys. A fem may be an attorney to deliver seizin to her husband." Co. Lit. 51 b, 52 a. "In another place [128 a] Lord Coke cites a passage from the Mirror which excludes both infants and femes covert from being attornies. . . . But that is quite reconcilable with the doctrine here; for there *public* attornies for prosecuting suits at law are meant, whose office cannot be properly executed without considerable knowledge and discretion; but here Lord Coke in the first part of the sentence confines himself to *private* attornies to deliver seizin, which is an act so merely ministerial that it may be done by the most ignorant." Hargr., *n.* 332. "What manner of men attorneys ought to be, or rather what they ought not to be, hear what antiquity hath said: *Attorneyes poient estre touts ceux, aux queux ley voile suffer. Femes ne poient estre attorneyes, ne enfans, ne serfs, ne nul que est en garde ou auterment faut de foy, ne nul criminous, ne nul essoigne, ne nul que n'est a le foy le roy, ne nul que ne poet este counter, &c.* Mirror, c. 2, s. 21." Co. Lit. 128 a. The authority of a private attorney "must be by deed that it may appear that the attorney has pursued his commission. Of this all persons are capable, . . . this being only a naked authority." Bac. Abr., Attorney.

"Forasmuch as in a writ of assise, attaints, and juris utrum, the jurors have been often troubled by reason of the essoins of tenants; it is provided that after the tenant hath once appeared in court, he shall be no more essoined, but shall make his attorney to sue for him, if he will." Westm. 1, c. 42. "By the policy of the common law, that suits might not increase and multiply, . . . both plaintiff and defendant, demandant and tenant, in all actions, real, personal, and mixed, did appear in person, . . . because the writs do command the tenant or defendant to appear, which was always taken in proper person; and the entry in every action for the demandant or plaintiff is, *et praedictus petens* or *querens obtulit se 4 die*, which was ever understood in proper person: but when this and other statutes had given way to appear by attorney, it is not credible how . . . suits in law (for the most part unnecessary and for trifling causes), when the parties themselves might sit quiet at home, increased and multiplied: so dangerous and ill success have ever had the breach of the maxims and ancient rules of the common law." 2 Inst. 249.

"Our lord the king of his special grace granteth that such as have land," in certain cases, "may make a general attorney to sue for them . . . ; which attorney or attorneys shall have full power in all pleas moved during the circuit, until the plea be determined, or that his master remove him." Westm. 2, c. 10.

"Here," says Coke, "is an act of grace . . . ; for where the king by his prerogative, before this and other statutes, might by letters-patents, or by writ under his great seal, grant to any demandant or plaintiff, tenant or defendant, to make attorney in any action, and command the judges to admit such persons to be attorneys for him: now justly is this act stiled an act of grace, for that the king gave his royal assent to this law for the quiet and safety of his subjects, giving them power hereby to make attorneys in cases herein expressed, whereby the king lost such profit of the great seal as he formerly received in such cases." 2 Inst. 377, 378.

"It seemeth that before the statutes which gave power unto a man to make an attorney, the justices would not suffer that the plaintiff, or the defendant, or the demandant, or the tenant, should make attorney in any action, . . .. because the words of the writ do command the defendant for to appear, &c., and that was always taken to be in proper person. The form of entry in every action for the plaintiff, or demandant, is; *Et praed. quer. obtulit se . . . & praed. def. non venit; ideo praeceptum est vic; quod*, &c., by which it is taken that the plaintiff was to appear in proper person. But now, by the statutes, he may make attorney in a court-baron, or other courts; and may make attorney for suit personal at the hundred or other court-baron; but for suit real at the leet, or at the sheriff's torn, he cannot do it by attorney, but he ought to do the same in proper person. But it seemeth that the king by his prerogative, and before the statutes, might give warrant unto a man to make attorney in every action or suit, . . . and that he may direct his writs, or letters, unto the judges of courts, commanding them to admit and receive such persons by their attorney, and that the judges are bound to do the same. . . .

"And if tenant for life be impleaded in a *praecipe quod reddat*, he in the reversion may pray to be received to defend his right upon the default of the tenant, or upon his faint pleading, and there he cannot pray to be received by his attorney. But if he bring a writ unto the justices out of the chancery, testifying that he hath made attorney there, and rehearse the cause whereof, that is to say, because he is sick, or other reasonable cause, and commanding them to receive such person by attorney for him in the reversion; the court ought and is bound to receive him by his attorney. . . . And the king, by his letters-patent, may licence a man to make a general attorney *in omnibus placitis motis & movendis, & in quibuscunque cur'*: and by his letters-patent he may express who shall be attorney, &c., or may grant to make attorney whom or who he will. . . . And the king, by his writ, may send to any person to receive attorney for another, such person generally as the other will name, or such persons specially; and that may be as well for the demandant or plaintiff, as for the

defendant or tenant.   And the king may give authority unto one person to receive attorney for another in all pleas, and in all courts, for two or three years.   And the king may grant a *dedimus potestatem* to receive attorney for another, for a special cause recited in the writ, because he is languishing, or lame, or decrepit, &c., or such other like special cause.   Or he may grant a *dedimus potestatem* in the generalty to receive attorney for another in all pleas, without expressing any cause in certain wherefore he doth so. And also it appeareth by the register that the king by his letters-patent may grant unto the prior of St. John's of Jerusalem that he may make two of his friars, and name them, &c., in his place, which is in the place of a proctor; that the two friars shall make attorney for the prior in every action which is pendant, or to be brought against him in any court, &c., and for to challenge his liberties, and for to defend them.   And also the king, by his letters-patent, may grant unto an abbot  .  .  .  that he may make a general attorney for all pleas, and in all courts; and the said abbot may remove him and put others in his room as often as it shall seem good and needful for him so to do: and so by this it doth appear that the king may grant unto all his subjects to make attorneys in the same manner, without putting or showing any cause in the letters-patent.   And it appeareth by the register that the king may grant the same as well by letters-patent under his privy seal, as by letters-patent under his great seal.

"And when the king makes a general grant unto an abbot, or unto any other, to make such general attorneys, then it seems the abbot shall come into the chancery, or shall send his deed under his seal unto the chancellor, witnessing that he hath made such and such persons his attorneys, etc.   And thereupon the chancellor shall make letters-patent unto the abbot, testifying that he hath made such and such persons his attorneys in all pleas and courts, and upon these letters-patent showed unto the court, the judge ought to admit and receive those persons for attorneys for the party; and these letters-patent shall be entered upon record in the chancery.   And the king may send his writ unto the justices of the common pleas, or unto the justices in eyre, or other justices whatsoever, testifying that such a one hath made his general attorney in all pleas and quarrels moved against him or by him, and also to challenge his franchises or to defend his franchises, commanding the justices by the writ that they receive him for attorney, &c.   There is another writ, also, in the register, that the king by his writ shall command his justices in eyre, that they admit and receive the claim of such a one to certain liberties, which he shall make and claim before them by his attorney, because himself cannot be personally before them at the day.   There is another form of writ to the justices, that they admit such a one by his attorney, whom the said party shall make his attorney by letters-patent under his seal.   And a man may make his attorney before the justices

without making an attorney in chancery, or without suing any writ unto the justices, commanding them to admit any attorney for the party, plaintiff, or defendant; as the common course is at this day for an attorney for every party to appear in every manner of action that they can appear by attorney, and put in their warrants without any such writs, if not that they be in writs of entry in the *post*, or writ which is by covin between the parties, or a writ of right: then the justices in discretion do not admit any man to appear an attorney for the party defendant, unless the defendant do before some justice confess him to be his attorney, and that the justices do record the warrant, or otherwise, that he bring a writ out of the chancery testifying that he hath there made at-. torney, commanding them for to receive him for his attorney. But there are divers cases in which the justices will not admit the defendant by attorney; as if he came in by *cepi corpus*, they will not admit him by attorney until he hath pleaded some plea, and then in discretion they use to suffer the defendant to make attorney. . . . And a man shall not make an attorney against the king in any action sued by the king. Upon a rescous returned by the sheriff, and an attachment awarded upon it against him, the defendant shall not make attorney; but upon his appearance shall be presently committed unto the Fleet. But if the king send a privy seal unto them commanding them that they admit attorney for him, the court ought to receive the attorney without appearance in proper person. . . . In a *praemunire* the defendant shall not make attorney without a special writ directed to the justices. After a *capias ad computandum* awarded, the defendant shall not make attorney. . . . He who pleads *misnosmer* shall not make attorney. . . .

"A feme covert may be attorney for her husband . . . And see in the register . . . writs directed unto the bailiffs of hund. to receive and admit such persons by attorney in court, which the party will make under his seal, or otherwise: and also writs of *dedimus potestatem* to remove attorneys made, and to put others in their places. . . . And if a man make attorney in chancery to answer and defend in other courts, he may come in chancery and remove him, and make others his attorneys: and thereupon he shall have a writ unto the justices of the court where the attorney is, testifying that he hath removed him and made another his attorney, commanding them for to receive him &c. There is . . . in the register . . . a writ directed unto the justices to receive an attorney for a woman who prayed to be received for the default of her husband. . . . There is another writ in the register directed unto the justices for him in reversion, where tenant for life is impleaded, commanding them for to admit attorney for him in the reversion, if the tenant for life make default, as he conceived he will, . . . because that he in the reversion hath such an infirmity that he cannot pray to be received

in proper person.   And the like writ for a feme covert, who hath a reversion, and the tenant for life is impleaded, and she conceiveth that her husband will not pray to be received, &c.   But in the writ it shall be mentioned that the feme is decrepit, or hath some other infirmity, that she cannot conveniently come to be received in proper person.   .   .   .   If a man be attorney for another in a plea real,   .   .   .   and afterwards by covin between the attorney and the demandant, the attorney makes default, for which the land is lost, the tenant who lost the land shall have a writ of disceit against the attorney.   .   .   .   An attorney shall have an action of debt against his client for money which he hath paid unto any person for his client, for costs of suit, or unto his counsel, &c."   Fitzh. N. B. 25–27, 96, 121.

   " The first colonists of New England were fishermen and farmers, their leaders were clergymen, and though they brought with them a general idea of English law and English liberty, the registers of writs were sealed books to them, as much as they are to us at this day.   Instead of attempting to follow the forms of the register, they devised processes of their own.   The recital of some of them will show that no reverence for any ancient forms existed among the courts here.   .   .   .   Judgments by default for want of any appearance after due service of a single proper process, was an original invention of New England, and has existed here since a very early date after the first settlement of the country.   .   .   . We are not aware of any objection to this ancient New England usage.   .   .   .   The foundation of the English common law, with its infinite niceties, was nothing more than usage; and usage here holds as high a place, in our esteem, as usage there.   Indeed, we regard the ignorance of the first colonists of the technicalities of the common law as one of the most fortunate things in the history of the law; since, while the substance of the common law was preserved, we happily lost a great mass of antiquated and useless rubbish, and gained in its stead a course of practice of admirable simplicity, and one which seems to us far better than the most improved codes of practice which have been recently introduced elsewhere."   *B. C. &. M. Railroad* v. *State*, 32 N. H. 215, 230, 231.

   The extracts from Fitzh. N. B., relating to the exercise of royal prerogative before the statutes allowed appearance by attorney, present a sample of what has been lost.   No prerogative or statute was ever necessary in this state to enable litigants to appear by their agents.   The law regulating the admission of attorneys is a part of the law of procedure (*ante, p.* 211); and our common law allows such procedure as justice and convenience require.   *Boody* v. *Watson*, 64 N. H. 162, 171–173, 178, 179.   Justice requires that a party should be permitted to conduct his cause in person (subject to reasonable requirements of propriety), or by any agent of good character, and that the test of the agent's character should not be so rigorously applied as to imperil the constitutional right to a fair

trial. But no one should commonly practise as an attorney without the mental and moral qualifications adequate for a business in which the administration of justice is deeply concerned, and in which his unfitness would naturally bring serious disaster upon his employers and himself. These rules of our common law of procedure have been affirmed by the legislature. G. L., c. 218, ss. 1, 2. As a mass of details, the English law on the subject, being inapplicable to our situation and circumstances, is not in force in this state; and if no relevant and decisive general principle of that law has been adopted here, this case must be determined by the common law that grows out of American conditions. *Concord Mfg. Co.* v. *Robertson, ante, pp.* 1, 6, 7; *State* v. *Saunders, ante, pp.* 39, 72, 73.

In *Olive* v. *Ingram*, 2 Str. 1114, "two points were made: 1. Whether a woman was capable of being chosen sexton [of a parish]. And, 2. Whether women could vote in the election. As to the first, the court seemed to have no difficulty, . . . nor did I think proper to argue it, there having been many cases where offices of greater consequence have been held by women, and there being many women sextons now in London. . . . As to the second point, 4 Inst. 5 was cited to show women could not vote for members of parliament or coroners. . . . But the court notwithstanding held that this being an office that did not concern the public, or the care and inspection of the morals of the parishioners, there was no reason to exclude women who paid rates from the privilege of voting: they observed, here was no usage of excluding them stated, which perhaps might have altered the case." "I am clearly of opinion," said *Lee*, C. J., delivering the judgment of the court, "that a woman may be sexton of a parish. Women have held much higher offices, and indeed almost all the offices of the kingdom: as Queen, Marshal, Great Chamberlain, Great Constable, Champion of England, Commissioner of Sewers, Keeper of a Prison, and Returning Officer for members of parliament. 2. As to the second point, it would be strange if a woman may herself fill the office, and yet should be disqualified to vote for it. The election of members of parliament and of coroners stands on special grounds. No woman has ever sat in parliament or voted for members of parliament, and we must presume that when the franchise was first created it was confined to the male sex. There was no reason for such a restriction respecting the office of sexton, whose duties do not concern the morals of the living, but the interment of the dead." 3 Camp. Ch. Jus. 63.

In 1787, a woman and two men, being the only householders of "the township of the monastery of Ronton Abbey," "an extraparochial place," were appointed overseers of the poor. *King* v. *Stubbs*, 2 D. & E. 393, 406. "We think," says *Ashurst*, J., delivering the opinion of the court, "that the circumstance of one of the persons appointed being a woman does not vitiate the

appointment.    The only qualification required by 43 Eliz. is that
they shall be *substantial householders;* it has no reference to sex.
The only question then is, whether there is anything in the nat-
ure of the office that should make women incompetent; and we
think there is not.    There are many instances where, in offices of
a higher nature, they are held not to be disqualified; as in the
case of the office of high chamberlain, high constable, and marshal;
and that of a common constable, which is both an office of trust,
and likewise, in a degree, judicial.    So in the case of the office of
sexton.    As to the case in Vin., tit. *Poor*, 415, that is no conclu-
sive authority.    It is to be collected from the case that there were
other persons in the parish proper to serve; and if so, the court
held that the justices had not acted improperly in refusing to
approve of a woman.    Where there are a sufficient number of men
qualified to serve the office, they are certainly more proper: but
that is not the case here; and therefore, if there is no absolute
incapacity, it is proper in this instance from the necessity of the
case.    And there is no danger of making it a general practice; for
as the justices are invested with a discretionary power of appro-
bation, it is not likely that they will approve of such an appoint-
ment when there are other proper objects."

In *Hearle* v. *Greenbank*, 1 Ves. 298 (*S. C.*, 3 Atk. 695), a testa-
tor had devised realty to trustees to the use of his daughter, a
married minor, during her life, with power, " notwithstanding her
coverture," to dispose of it as she should think fit; and while a
minor, she made a will, devising it in pursuance of the power.
*Hardwicke*, Ld. Ch., holding that the power was not executed,
said,—" There are some kind of powers an infant may execute: as
where he is a mere instrument or conduit pipe, where no prudence
or discretion is required, or where his right is not affected.    1 Inst.
52 a.    ' Few persons are disabled to be private attornies to deliver
seizin : for monks, infants, feme coverts, &c., may be attornies.'
As this opinion of Lord *Coke* is delivered, it seems at first as if he
meant only to deliver seizin; which is merely a ministerial act:
although the latter words are general.    Yet he himself (1 Inst.
128 a) says that an infant cannot be an attorney : it is therefore
pretty much undetermined how far infants can be attornies, unless
to deliver seizin or such a ministerial act.    But that is different
from these kind of powers.    .   .   .    It is said that a feme covert
may execute a power; (which was so determined in *Rich* v. *Beau-
mont* upon the execution of a power created before she was covert:
and so in a case before Lord *King*) so a power to a *feme covert*
to make leases is good.    .   .   .    I take it in law that the disabil-
ity of an infant with respect to the real estate is more favored,
and a stronger disability, than that of *feme coverts*.    In Hob. 95,
there are some cases put: and there is a marginal note very ma-
terial.    And here I will take notice, that the notes in Hob. are
allowed to be his own.    The note is this, ' coverture was not at

common law so far protected as infancy, and some other disabilities, as *non sane memory*, &c.' the ground of the disability being not from want of judgment, but from being under the power of her husband; she having as much judgment as if discovert. . . . The disability of an infant arises from want of judgment."

"A grant of an office requiring skill, to an infant, to be exercised *in praesenti*, is void. . . . Offices merely ministerial, which do not require particular skill and knowledge, and exercisable by deputy, may be granted to any person, and even to women. Thus, a woman may have the office of the custody of a castle. And Lord Coke [4 Inst. 3, 11] mentions an instance of a woman's having the office of forester in fee simple; but he observes that she could not execute the office herself, but was obliged to appoint a deputy, during the eyre, who should be sworn." The earl of Hereford held manors of the king " by the service of being constable of England; and had issue two daughters. Upon a question how the daughters, before marriage, could exercise the office; it was resolved that they might make their sufficient deputy to do it for them; and after marriage the husband of the eldest might do it alone. . . . The following question was put to the judges: ' The late Duke of Ancaster having died seized of the office of great chamberlain of England, leaving' two sisters, ' does the said office belong to the eldest alone, or to both? . . . Or does it devolve upon the king to name a proper person to execute the office, during the incapacity of the heir?' The judges delivered their unanimous opinion,—' That the office belonged to both sisters; . . . that both sisters might execute it by deputy, to be appointed by them.' " 3 Cru. Dig. 123–126.

*Cobbett* v. *Hudson*, 15 A. & E. N. S. 988, " was an action against the keeper of the Queen's prison for a false return to a *habeas corpus*. On the trial, before *Pollock*, C. B., . . . the plaintiff, who was in custody, did not appear by either counsel or attorney, or in person; but his wife appeared, and proposed to conduct the cause on his behalf. The Lord Chief Baron, after conference with *Erle*, J., refused to permit this; and the plaintiff was nonsuited. . . . The plaintiff in person now moved that the nonsuit might be set aside. . . . Lord *Campbell*, C. J. We cannot say that the Lord Chief Baron was wrong in refusing to hear the wife of the plaintiff as an advocate. The nonsuit was regular. The plaintiff was called, and appeared neither by counsel or attorney nor in person; but his wife claimed to appear for him. The question therefore is, whether, as of right, the wife of a party may insist on appearing on his behalf in a civil cause. There is no such rule in a civil suit. The first day I sat here, Mrs. Cobbett desired to make a motion on behalf of her husband for a *habeas corpus*; and I heard her without the smallest scruple, as my illustrious predecessor *Hale* heard the wife of John Bunyan. [2 Camp. Ch. Jus. 210–213.] On each of those occasions the liberty

of the subject was in question; and in such a case great incon-
venience might arise from refusing to hear the wife, or any person,
on behalf of the party who was under restraint. But a proceeding
at *nisi prius* is very different: there can be no similar necessity
there for the wife's appearance as counsel to conduct the cause for
her husband. There would at least be opportunity for applying to
a gentleman of the bar; and we know that on such an occasion
any member of the bar would come forward without an *honorarium*,
and see justice done. And this would be much better than that
the wife of a party should come into court to wrangle at *nisi prius*,
and engage in scenes inconsistent with the character of her sex.
1 think the Lord Chief Baron and my brother *Erle* did right.

"*Coleridge*, . . . *Wightman*, and *Erle*, Js., concurred. Rule
refused."

" The real question . . . is whether an infant is by law
capable of discharging the duties of a deputy of the sheriff, spe-
cially deputed to serve and return a particular writ of attachment.
. . . It seems always to have been held that an infant could
not be a juror. . . . So he could not be an attorney of a
court, . . . nor administrator of an estate, . . . nor could
he act as an executor until he arrived at the age of seventeen
years. . . . An infant could not execute the office of a judge,"
nor " hold the office of clerk of a court where it was part of the
duty of the office to receive the money of the suitors. . . .
But notwithstanding these disabilities, there are many things
which can be legally done by an infant. . . . Females of the
age of twelve, and males of the age of fourteen years, may dispose
of personal property by will. . . . It has long been settled
that infants were capable of holding certain ministerial offices.
. . . Upon a thorough examination of the adjudged cases,
. . . we are satisfied that the principle they establish is that
some offices can and some cannot be held by infants. Offices
where judgment and discretion and experience are essentially nec-
essary, . . . are not to be entrusted in the hands of infants.
But they may hold offices which are merely ministerial, and which
require nothing more than skill and diligence. . . . The ser-
vice and return " of the writ " seem . . . to be as merely min-
isterial [Mechem, Public Officers, ss. 657–659] as any that can be
conceived." *Moore* v. *Graves*, 3 N. H. 408, 410–412. The liabil-
ity of the sheriff was held to be ample protection for all who
might be injured by the acts or negligence of the special deputy.

The appointment or election of a person to a public position, 'the
payment of his wages by taxation, and the importance of his work,
are not conclusive proof that his public duty is, in the ordinary sense,
a public office. A teacher of a public school, who is selected by
the school board, but is not an officer (32 Vt. 122), is paid by the
district. A register of deeds, who is an officer, is paid, like a
physician or attorney, by individuals who happen to need his ser-

vices. "As morality and piety . . . will give the best and greatest security to government," the legislature is empowered to authorize " the several towns, parishes, bodies corporate or religious societies . . . to make adequate provision . . . for the support and maintenance of public . . . teachers of piety, religion and morality. *Provided* . . . that the several towns, parishes, bodies corporate, or religious societies ·shall . . . have the exclusive right of electing their own public teachers, and of contracting with them for their support and maintenance." Bill of Rights, *art.* 6. This is the substance of the act of 1714, which was an enactment of previous custom. 53 N. H. 139, 231. From an early day in the history of the province until 1819, the town minister was chosen by the majority of voters in town meeting. His salary was paid from the town treasury. His employment as teacher in a meeting-house, built and controlled by the town for public use, was public. In a certain sense, it was official, like that of a teacher of a public school. But it was non-official in such a sense that women could legally be called to it. In the exercise of their parochial right of electing ministers, towns were as unrestricted as voluntary religious societies are now. If women had never been teachers of public schools, they could be employed as such, notwithstanding the usage, and without an alteration of the law, because that public employment has not been understood to be an office. Not being an office in the ordinary sense, it is open to women at common law, whatever the usage may have been. " The relation that subsists between a minister and the town [by which he is elected] is civil; that which subsists between a minister and the church is spiritual." "Public teachers of religion and morality chosen by a " town, "are to every purpose civil officers of the state, as much so as school-masters and magistrates." *Muzzy* v. *Wilkins*, Smith (N. H.) 1, 14. In such a connection, no distinction being made between public office and other public employment, " civil officers of the state " means persons in the civil service of the state.

Great numbers of persons, male and female, who are not regarded as public officers, are employed by the public, and selected and paid by public authority. In the civil service, the classification is not as distinct as among privates and commissioned and non-commissioned officers, and the location of the official line, at some points, may be a subject of controversy. In some instances, a test may be found in that universal understanding which is the sanction and source of much common law. 107 Mass. 604; Shars. Law Lec. 196–199. While a removal of common-law disability by legislation was necessary to enable women to be members of school boards (G. L., *c.* 87, *s.* 10, Laws 1879, *c.* 57, *s.* 19), no statute was required to authorize their election as public teachers. "Although an office is an employment, it does not follow that every employment is an office. A man may certainly be employed under a

contract, express or implied, to perform a service without becoming an officer." *U. S.* v. *Maurice*, 2 Brock. 96. "A public office . . . is never conferred by contract. . . . Where, therefore, the authority in question was conferred by a contract, it must be regarded as an employment, and not as a public office." Mechem, Public Officers, *s.* 5. Ministers elected by towns were considered a class of teachers employed by contract. In this and other cases, the making of contracts by voters in town-meeting was an exercise of governmental power. "A government office is different from a government contract." *U. S.* v. *Hartwell*, 6 Wall. 385, 393. A contractor for carrying the mail is not an officer of the government, nor is the employment an office. *Whitehouse* v. *Langdon*, 10 N. H. 331.

Under a constitutional provision that no senator or representative should, during the term for which he was elected, "be appointed to any civil office of profit" under the state, which had been created during such term, the justices were of opinion that "every 'office,' in the constitutional meaning of the term, implies an authority to exercise some portion of the sovereign power, either in making, executing, or administering the laws;" and that an agent appointed by the governor, under a legislative resolution, for the preservation of timber on the public lands and for other purposes, would not hold such an office, and need not take the oath required by the constitution of persons elected or appointed to "office under this state." 3 Greenl. 481, 483; *U. S.* v. *Hatch*, 1 Pinn. 182. In dispersing a mob or suppressing an insurrection, sovereign power may be exercised by the rank and file, as well as by the governor, president, or other commander-in-chief. In making a lawful arrest, the sheriff exercises the same power; and a woman, giving him necessary assistance, though not an officer, is not a trespasser. 5 C. & P. 260, 261, *n.;* L. R. 6 Q. B. 15. In executing the laws, the sovereign power employs many officers, and many agents and workmen who are not officers. Mechem, Public Officers, *cc.* 1, 2; Paine, Elections, *ss.* 126, 127.

A selectman is a public officer. *State* v. *Boody*, 53 N. H. 610. A representative in the legislature is a state officer within the meaning of the act of June 23, 1813. *Morril* v. *Haines*, 2 N. H. 246. In *Doyle* v. *Aldermen*, 89 N. C. 133, the plaintiff was elected an alderman of a city while acting, under an appointment from the treasury department of the United States, at a salary of $60 a month, as night watchman of a post-office building. The state constitution provided that "No person who shall hold any office or place of trust or profit under the United States, or any department thereof, . . . shall hold or exercise any other office or place of trust or profit under the authority of this state." It was held that the plaintiff's federal employment was not an office or place of trust or profit. In such a case there might be doubts, or a difference of opinion. A public service may be an office or place

of trust for some purpose, in some sense, within the meaning of one law, though not an office or place of trust for all purposes, in every sense, within the meaning of other laws; and legislative intent may be defeated by an invariable definition. In *Rowland* v. *Mayor*, 83 N. Y. 372, the question was, whether supervisors had authority to increase the plaintiff's compensation as "an attendant upon the supreme court." A statute had prohibited their "creating any new office, . . . or increasing the salaries of those now in office." It was held that the object of the law was to limit expenses; that it was reasonable to suppose "the legislature had in mind . . . all persons who, under any name, were the recipients of 'salaries' from the city treasury; and that in this extended sense the words of the act should be construed."

"The term 'office' has no legal or technical meaning attached to it, distinct from its ordinary acceptations. An office is a public charge or employment; but, as every employment is not an office, it is sometimes difficult to distinguish between employments which are and those which are not offices. . . . 'A public officer is one who has some duty to perform concerning the public; and he is not the less a public officer when his duty is confined to narrow limits, because it is the duty, and the nature of that duty, which makes him a public officer, and not the extent of his authority.' 7 Bac. Abr. 280; Carth. 479. . . . Where an employment or duty is a continuing one, which is defined by rules prescribed by law and not by contract, such a charge or employment is an office, and the person who performs it is an officer. . . . The powers vested in the government of the state of Mississippi are either legislative, judicial, or executive; and these respective branches of power have been committed to separate bodies of magistracy. . . . Whether an office has been created by the constitution itself, or by statute, . . . the incumbent, as a component member of one of the bodies of the magistracy, is vested with a portion of the power of the government. . . . The words 'civil office under the state' . . . import an office in which is reposed some portion of the sovereign power of the state, and of necessity having some connection with the legislative, judicial, or executive departments of the government. . . . The local and limited power and duties of the levee commissioner can have no effect in determining the question whether his office is not an office under the state. A member of the board of county police, or a justice of the peace, is as much an officer under the state as the executive, the heads of department, or a member of the judiciary. The powers attached to the office of levee commissioner evidently pertain to the executive branch of the government. Clothed with a portion of the power vested in that department, the commissioner, in the discharge of his proper functions, exercises as clearly sovereign power as the governor or a sheriff." *Shelby* v. *Alcorn*, 36 Miss. 273, 288–290, 292. The constitution provided that "no senator

or representative" should, during his term, "be appointed to any civil office of profit under this state," which had been created during his legislative term. The object of the clause was manifest, and the office of levee commissioner was held to be within the mischief which the prohibition was intended to prevent.

"By the constitution of 1846 (*art.* 6, *s.* 8), the judges of the court of appeals and justices of the supreme court were prohibited from exercising 'any power of appointment to public office.' . . . The term 'office' has a very general signification, and is defined to be that function by virtue whereof a person has some employment in the affairs of another; and it may be public, or private, or *quasi* public, as exercised under public authority, but yet affecting only the affairs of particular individuals. The presidency of a bank is spoken of as an office, and a trustee of a private trust is, in ordinary parlance, said to hold the office of trustee; and the term office is applied to an executor or guardian, etc. A referee, for the trial and decision of actions, is an officer exercising judicial powers under public authority. So, receivers appointed by the courts, and commissioners for the appraisal of damages for lands taken for public use, are officers, and strictly and technically exercise the functions of an office. But they are not public officers, within the inhibition of the constitution. . . . They are not called upon to take the constitutional oath of office." Opinion of the majority in *Matter of Hathaway*, 71 N. Y. 238, 242, 243. "The power of courts of law and equity to appoint referees and receivers . . . was a part of their acknowledged authority and jurisdiction prior to and at the time of the adoption of the constitution. They were said to be officers of the court. . . . The power of the courts to act through official agencies of their own appointment . . . was incident to their jurisdiction, and passed to the supreme court as a part of the general jurisdiction of law and equity, conferred by *s.* 3, *art.* 6 of the constitution. . . . Assuming, therefore, that receivers and referees are public officers (a point which we do not determine), the power of appointment . . . was continued in the new supreme court by the . . . constitution." Opinion of the minority in the same case, *pp.* 252, 253.

"An attorney at law is an officer of the court. The terms of the oaths exacted of him at his admission to the bar prove him to be so; 'you shall behave yourself in your office of attorney within the court, with all due fidelity as well to the court as the client.'" *Austin's Case*, 5 Rawle 191, 203. "Attorneys who have been admitted to practice as such are officers of the court, of whom the court will take judicial notice, and generally will not require them to show their authority to appear; and if questioned, the declaration of the attorney that he has such authority will ordinarily be sufficient." *Stevens* v. *Fuller*, 55 N. H. 443; *Thomas* v. *Steele*, 22 Wis. 207, 209. "The agreement was signed by the attorneys of

record. They were officers of the court; and their signatures were judicially known to the court." *Strippelmann* v. *Clark*, 11 Tex. 296, 298. "The office of an attorney is *quasi* public, and his conduct *semi* official." *Ex parte Walls*, 73 Ind. 95, 106.

"For the better understanding in what cases the court may proceed in the manner above mentioned [summarily by attachment] . . . I shall endeavor to show: Where it may so proceed against the ministers of the court; and, Where against others. As to the first of these points, I shall consider Where it may so proceed against sheriffs, bailiffs of franchises, and sheriffs bailiffs. Where against attornies, and others acting as such. Where against other officers. . . . I shall endeavor to show, First, Where the court may so proceed against sheriffs, bailiffs of franchises, and sheriffs bailiffs, for not executing a writ. Secondly, Where for doing it oppressively. Thirdly, Where for not doing it effectually. Fourthly, Where for making a false return. . . . As to the second point, *viz.*, In what cases the court may proceed in the manner above mentioned, against attornies, and others acting as such, I shall endeavor to show, First, Where it may so proceed against them for appearing for a person without sufficient authority. Secondly, Where for injustice to their clients. Thirdly, Where for . . . dishonest practice. . . . Where the court may proceed, in the manner above mentioned, against other officers of the court. There being scarce anything of this kind to be met with in the books, I shall only observe that it seems clear, from the general reason of the law, which gives all courts of record a kind of discretionary power in the government of their own officers, that any such court may proceed in such manner against any such officer, not only for refusing to execute its commands, or for executing them irregularly, remissly, or oppressively, but also for all kinds of oppression or injustice done by them in the execution of their offices, or by color of them. . . . In what cases counsellors are punishable in the manner above mentioned. It seems clear, that notwithstanding they are neither officers of any court, nor invested with any judicial office, but barely practise as counsellors, yet inasmuch as they have a special privilege to practise the law, and their misbehavior tends to bring a disgrace upon the law itself, they are punishable for any foul practice as other ministers of justice are." 2 Hawk. P. C., *c.* 22, *ss.* 1, 5, 12, 30.

"Attornies and solicitors are to be considered as public officers and ministers of justice. Upon this ground it is, that in courts both of law and equity they have stated fees allowed them for their service, and are under the government of the several courts in relation to their behavior to their clients. The courts exercise a much larger authority over them, and interfere much more in contracts which they make with their clients, than they do in other cases. . . . Upon this ground it is, that if an attorney accepts a retainer from his client, and does not appear for him, the court

will compel him to do it. . . . Attornies and solicitors, when they have accepted retainers from their clients, are bound to serve them for the stated fees which are allowed by the several courts." *Hardwicke*, Ld. Ch., in *Walmesley* v. *Booth*, Barn. Ch. 478, 479. "It is because attornies and solicitors are regarded as officers of the court, that our courts have been in the habit of granting relief against them by summary motion, treating the act as one of official misconduct in an officer of the court, and there to be redressed in a summary manner." *Waters* v. *Whittemore*, 22 Barb. 593, 595.

*Merritt* v. *Lambert*, 10 Paige 352, " came before the chancellor upon an appeal of J. Wallis, one of the solicitors and counsellors of this court, from an order of the vice chancellor, . . . made upon the application of Loubat, who was a purchaser *pendente lite* of part of the property in litigation in this cause." The suit was brought by Merritt against Lambert for the specific performance of a contract to exchange lands, and the bill was dismissed. Wallis was originally employed by Lambert. During the pendency of the suit a receiver was appointed of the rents of Lambert's land, which rents came into the hands of Wallis when the bill was dismissed. Loubat had employed Wallis to defend his title to a part of that land. After the bill was dismissed, Loubat applied for an order that Wallis pay him his share of the rents. The vice chancellor directed a reference to a master to ascertain and report the amount of the rents of Loubat's lot received by Wallis; and also to ascertain and report what reasonable counsel fees should be allowed to Wallis; and that upon the confirmation of the master's report Wallis should pay Loubat the balance, if any, remaining in his hands after deducting taxable costs and reasonable counsel fees. *Walworth*, Ch , affirming this order, said,— " The principles upon which the court proceeds, in cases of this kind, are stated . . . by Lord *Hardwicke* in *Walmesley* v. *Booth*, Barn. Ch. 478. He there says attorneys and solicitors are to be considered as public officers and ministers of justice. . . . If an attorney extorts more money from his client than the courts allow of, or makes a contract with his client to have more money, the courts will give relief. . . . In England, the duties of attorney or solicitor, and counsel, are always performed by different persons; and of course the attorney or solicitor cannot be permitted to stipulate for any greater compensation for his services than such as are allowed by the practice of the courts, or by the tariff of fees fixed by law. The same rule prevails here, so far as relates to the mere services of an attorney or solicitor. But as most members of the profession practise in the capacity of counsel, as well as in that of solicitor or attorney, if the client agrees with his solicitor or attorney to perform the duty of counsel also, . . . the latter, in his character of counsel, may stipulate for a reasonable reward for his services as such counsel. . . . But he is not permitted, either as attorney or solicitor, or as counsel, to con-

tract with his client . . . for a part of the demand, or subject-matter of the litigation, as a compensation for his services." This statement of the law shows the ground of Chancellor *Walworth's* previous decision in *Bleakley's Case*, 5 Paige 311, and of his opinion, afterwards expressed in *Ray* v. *Birdseye*, 5 Den. 619, 627, that " the attorney who issued the execution was a public officer appointed under the authority of this state."

In *Leigh's Case*, 1 Munf. 468 (decided in 1810), the question was, whether an attorney at law was a person " appointed to any office or place, civil or military, under this commonwealth," within section 3 of an act to suppress duelling, which prescribed a certain oath to be taken by every such person. On his motion to be admitted to the bar of the supreme court of appeals, without taking this oath, " Mr. Leigh insisted that the practice of law was not an *office or place under the commonwealth*, within the meaning of the act; that the act intended *public* offices only, and not *private* ones of any kind. I agree, said he, it is laid down, generally, that attorneys at law in England are in all points officers of the respective courts in which they are admitted. 3 Bl. Com. 26. But their character of officers of court in England is derived from certain restrictions they are under, and privileges they enjoy, in that country, unknown in this. In England, attorneys cannot be bail in civil cases; nor can attorneys at law practise as solicitors in chancery; nor attorneys in one of the courts of Westminster in any other; nor can they be called to the bar till struck off the roll of attorneys; nor, if once admitted barristers, enrolled as attorneys again, till disbarred at their inns of court. . . . On the other hand, attorneys cannot, regularly, be held to special bail; they must be sued by bill, not by original; they can only be sued in the courts they belong to; and they are exempt from serving in offices they may be elected to against their inclination. . . . Barristers at law (king's counsel excepted) . . . take no oath of office, and are not deemed officers of court. In Virginia, no such restrictions or privileges exist: here attorneys are counsel. In England, too, it was formerly held that attorneys were compellable to act. Co. Lit. 295 a. But it has been since adjudged, that an attorney is not compellable to appear for any one, unless he take his fee, or back the warrant. 1 Salk. 87. And even if the law, as stated by Coke, has not been thus exploded; still *counsel* were never thought compellable to act (Harg. note 252, to Co. Lit. 295 a.); and as in Virginia, the characters of attorney and counsel are inseparably blended in the same person, so that one cannot be engaged as attorney without being engaged as counsel, in which latter capacity he is on no principle compellable to act; it results that no part of the profession is so compellable in this country. Attorneys therefore are no more officers of the court here, than counsel are in England. A class of men they are, indeed, in this as well as in that country, *concerned* in the administration of

justice, to whose diligence, integrity, ability, and honor much is necessarily confided; . . . sworn to do their duty, regulated by rules of policy and practice, and liable to summary punishment and privation for unworthiness or misconduct. But these, their only traits of the officer known to our law, they have in common with jurors. . . .

"But granting that attorneys are on the same footing here as in England; that they are officers of court; still, Mr. Leigh contended, they are not public officers within this act. In fixing the legal construction of this our test, said he, I could not . . . forbear looking into the construction put by English legislators and lawyers on their corporation, test, and abjuration acts, which are known to have been enforced and interpreted in a spirit that the most rigorous expounder of our test cannot except against. . . . By the abjuration act, 13 Wm. III, c. 6, it was enacted 'that every person who shall bear any office, civil or military . . . and all persons teaching pupils, etc., and all preachers. etc., and every person that shall act as a serjeant at law, counsellor barrister, advocate, attorney, solicitor, clerk, or notary, by practising as such in any court, shall, within three months after they enter upon such office, or take upon them such practice,' take the oath of abjuration. . . . The alternative words (*or take upon them such practice*) plainly referred to the legal characters before mentioned, and showed that the parliament did not deem their profession, nor was it generally understood to be, an office or place under government; if they had thought so, those words would not have been inserted. And by the corporation act, 13 Car. II, *stat.* 2, *c.* 1, it was enacted 'that no person shall be placed or chosen in any office of mayor, alderman, recorder, bailiff, town-clerk, common councilman, or other office of magistracy, place, trust, or employment, concerning the government of any city, borough, or cinque port, and their members, or other port town, that shall not, within one year next before such choice, have taken' the oaths of supremacy, etc. . . . If any words would include the attorneys of corporation courts, as officers or placemen, those of this statute would. Yet it had been expressly adjudged that an attorney was not an officer within that act. *Hurst's Case.* T. Ray. 56, 94; Sid. 94, 152; 1 Keb. 349, 354, 387, 558, 675. . . . In all the notices of this case, the only question ever raised was, whether an attorneyship was such a place as that a mandamus would lie to restore one to it; . . . but no doubt was ever entertained that the attorney was not within the corporation act. . . .

"If the profession of the law be an office or place under the commonwealth at all, it is a *lucrative* one. Now the constitution of Virginia expressly provides that all persons 'holding lucrative offices shall be incapable of being elected members of either house of assembly or the privy council.' Art. 14. If, then, the construc-

tion I am controverting be right, lawyers are excluded from the assembly and the council. Yet the framers of the constitution . . . and their successors ever since, never (as we know) had any such idea. The whole practice of the constitution, from its origin to this day, the contemporaneous, the present, the constant exposition of it, refutes this inference . . . that attorneys are officers under government. . . . By the constitution of the United States, *art.* 1, *s.* 6, *cl.* 2, 'No person holding any office under the United States shall be a member of either house during his continuance in office.' Is it, or has it ever been, thought that hereby the bar of the federal courts are excluded from congress? . . . By the act of 1788, . . . 'all persons who shall hold any legislative, executive, or judicial office, or other lucrative office whatsoever, under the authority of the United States, shall be . . . incapable of holding . . . any legislative, executive, or judicial office, or other lucrative office whatsoever, under the government of this commonwealth.' And by the act of 1799, . . . 'No person holding or occupying any office or place, or any commission or appointment whatsoever, civil or military, under the authority of the United States, whether any pay or emolument be attached to such office, place, commission, or appointment, or otherwise, . . . shall be capable of being elected to or holding any office, legislative, executive, or judicial, or any other office, place, or appointment of trust or profit, under the government of this commonwealth.' If lawyers in the state courts are officers or placemen under the commonwealth, lawyers in the federal courts are so under the United States, and are . . . excluded, not only from all political and military state offices, but from the state bar also. . . . It never occurred as a possible opinion, that lawyers of the state or federal bar are officers under the state or federal government. . . .

" Mr. Leigh knew of only two objections to his argument, which had been deduced from our own laws and usages. One was, that under a *general* provision that all *officers of government* shall take the oath of allegiance, the members of the bar, state and federal, have been always held bound to take that oath ; that is, they have been held to be *officers under government*. But this objection . . . was founded on a plain mistake : . . . it was not from any such reasoning or inference, but from positive and express provision, that the profession had been required to take the oath of allegiance to the state or to the Union. . . . Another objection was, that the act of 1792, *c.* 71, *s.* 2, directs that counsel and attorneys 'shall take an *oath of office*,' namely, 'I do solemnly swear that I will honestly demean myself in the practice of the law, as counsel or attorney, and will in all respects execute my *office* according to the best of my knowledge and abilities.' This objection . . . begged the whole question ' . . . The lawyer swears he will execute his office : What office ? The practice of

the law. And this brought it back to the first point; the *nature* of that office. *Office* there meant no more than *duty*. . . . In a large sense, an attorney at law is an officer; so is an attorney in fact, an administrator, a physician, and who not? In the largest sense, every duty is an office. . . . The question here is, not whether the practice of the law be an *office*, but whether it be (as the chief justice says. 5 Mod. 432) a *public* office or not. . . .

"Judge *Tucker*. On a former day of this term, Mr. Leigh, a gentleman who has practised as an attorney and counsel for several years in the district courts, county courts, and court of chancery, made a motion to be permitted to practise in this court. A question was propounded whether he must take the oath prescribed by the act of the last session for the suppression of duelling. I was of opinion that he could not be permitted to practise in this court without taking that oath. My opinion was founded upon these principles: That an attorney at law is a *public* officer; that his license is only an inchoate step to office ; that he becomes an officer in that court *only* in which he qualifies as the law directs; that his admission to practice in one court does not authorize him to practise in any other court; . . . that such an admission was equivalent to an *appointment*, inasmuch as he thereby becomes an officer of that particular court. . . . In England, an attorney at law is considered as a public officer; otherwise a *mandamus* would not lie to restore him. The whole context of our act concerning counsel and attorneys at law, between whom there is no distinction in this country, proves the same thing. . . . They are subject to penalties to which no private citizen could possibly be subjected. Let a single example suffice: The lawyers practising in the inferior courts may demand for an opinion or advice, where no suit is brought, or prosecuted or defended, by the attorney giving such advice, but not otherwise, $1.67; those in the general court $3.58, for advice, under the same restrictions. And every lawyer exacting, taking, receiving, or demanding any greater fee, or other reward, is subjected to a heavy penalty. Under what color or pretext could the legislature impose a penalty on any other than a *public officer* for demanding and receiving $100 or $1,000, or any other sum whatever, for giving his *advice* to any person willing to pay for it? . . . Whether the legislature, the executive, or the court *appoints* or *admits* to an *office*, the *office* or *place* is held or exercised under the authority of the commonwealth. . . .

"Judge *Roane*. . . . An attorney is defined to be one who is set in the place of another, and he is either *public*, as an attorney at law, or *private*, as being delegated to act for another in private contracts or agreements. 1 Bac. 287 ; Co. Lit. 52. With respect to these public attorneys, or attorneys at law, in order to ensure a due degree of probity and knowledge in their profession, so indispensable to persons acting in that character,

none are permitted to act as such but those who are allowed by the judges to be skilled in the law, and certified by the court of the county of their residence to be persons of honesty, probity, and good demeanor.   As a further guard against improper practices in their profession, they are required to take the oath prescribed by the act upon this subject.   .   .   .   Having obtained the sanction of these two tribunals touching these two particulars, an attorney is *licensed* or *allowed* to practise; and the courts have also a continuing control over them, with power to revoke their licenses for unworthy practices or behavior: but the licensing judges cannot be said to 'elect' or 'appoint' an attorney: he can, perhaps, only be said to be 'appointed' by the particular clients, who, after he is licensed, may severally employ him.   This result is entirely justified by a view of the act 'concerning attorneys at law and counsel,'   .   .   .   in which these functionaries are nowhere said to be 'elected' or 'appointed,' either by the government or the licensing judges, nor are their functions anywhere called or designated as 'offices' in the act, except in the form of the oath prescribed to be taken; and even there that term may well be taken in a general and extended sense, as synonymous with 'duty.'   The act, it is true, prescribes an oath to be taken as aforesaid, previous to being allowed to practise; but that can only be considered .   .   .   as an *additional* security for the good conduct of the attorney.   It would be too much to say that this single circumstance of precaution (any more than those of the license and certificate of the county court before mentioned) shall exalt that functionary into an 'officer,' when he is neither said in the law to be 'appointed' to any office, nor to *hold* any office, and when he receives no salary or emolument except the fees which individual citizens may please to give him.   If this single circumstance should be construed to have that effect, it might be equally argued to have a similar effect in relation to jurors.   .   .   .

"It is not necessary in this case to consider whether, and in what degree, attorneys are considered in this country (as they are in England) officers *of their respective courts;* though it is easy to see that an attorney in this country not having as many privileges as the English attorneys, in consideration of which that character is there holden to attach, a difference may probably exist in this country in this particular.   .   .   .   Even admitting   .   .   .   that attorneys are, in some sense and in some degree, officers of their several courts, as they are held to be in England, the question still recurs, Are they officers within the meaning of the act to suppress duelling?   .   .   .   The 2d section declares that a person accepting a challenge, &c., 'shall be incapable of *holding* or being " *elected* " to any post of profit, trust, or emolument, civil or military, under the government of this commonwealth.'   It relates as well to persons *now* in office as to those *to be elected* thereto.   .   .   .   The former must have been *elected.*   .   .   .   This part of the clause

. . . excludes attorneys at law, who . . . are neither 'elected' nor 'appointed' to office, but are merely *permitted* to practise by those who are constituted by law judges of their character and qualifications. . . . Admitting . . . that attorneys are to be considered as 'officers,' they are only considered, even in England, . . . as officers of their respective courts. 1 Bac. 287. They do not, therefore, come up to the *desideratum* of this act; they are not officers *under the government of the commonwealth.* There is no just ground on which we can erect, by implication or construction, into *governmental* officers, those who, in England, are not exalted to that character, and who, in the only books and doctrines handed to us on the subject from that country, are held, at most, to be mere subordinate officers of *their respective courts.* But if attorneys could be even considered as officers of the government, they do not hold an office of *profit* or *emolument* under the government (or, in other words, a *lucrative office*); otherwise they would have been excluded from a seat in the legislature by the provisions of the constitution. . . .

"The words of the oath, . . . 'during my continuance in office,' seem to indicate those public offices which are held by commission or appointment, and are wont and proper to be *resigned;* they do not naturally apply to a function which is never resigned or formally given up, which it is the right of one citizen to exercise at the request and for the benefit of another, and in respect to which the *regulating* hand of the legislature has only interposed for the salutary purposes before mentioned. . . . It has never been pretended (although, if attorneys when they practise in the state courts thereby become officers of the commonwealth, they equally become officers of the general government when they practise in the federal courts) that the attorneys practising in the latter courts cannot also practise in the former. . . .

"Judge *Fleming.* . . . Practitioners of the law are not comprehended in the act, under these words, 'every person who shall be appointed to any office or place, civil or military, under the commonwealth, shall, in addition to the oath now prescribed by law, take the following oath,' &c. The practice of the law is a profession which every citizen of the state, having complied with certain requisites, . . . may take up, engage in, and exercise according to his own will and pleasure; and which he may lay down, and resume, as often as to him may seem convenient, without any responsibility for his conduct in so doing. . . . The officer taking the oath, after swearing 'that he hath not been engaged in a duel,' . . . is further to swear that 'he will not be so concerned, directly or indirectly, in such duel, *during his continuance in office;*' which . . . has no allusion to practitioners of the law." Mr. Leigh was therefore admitted without taking the oath.

In *Byrne* v. *Stewart*, 3 Desaus. 466 (decided in 1812), it

was held that the office of a solicitor in a court of chancery is not a public office. "He is not appointed by the legislature," says Chancellor *Waties* (*pp*. 478, 479), "nor is he amenable to it, for he does not possess any portion of the public authority. His admission to practice is indeed regulated by law, but it is in the power of any man, who will comply with the legal requisites, to become a solicitor, independently of the will of the legislature. He can be considered in no other light than that of a private agent for the citizens of the country, who may employ him to do their legal business in the courts; and although the law requires of him certain qualifications, and he receives a license from the judges, yet his office is no more a public one than would be any other profession or trade which the legislature might choose to subject to similar regulations, and which is the practice in many other countries."

"The 'act to suppress duelling' [passed in 1816] . . . requires ' every member of the senate or of the assembly, and every person who shall be elected or appointed to any office or place, civil or military, except town officers, and every person who shall be admitted a counsellor, attorney, or solicitor . . . to take an oath that he has not been engaged in a duel." A new section of the constitution of 1821 "ordains that members of the legislature, and all officers, executive and judicial . . . shall take . . . an oath or affirmation to support the constitution of the United States, and the constitution of this state, and also faithfully to discharge the duties of his office; and that ' no other oath, declaration, or test shall be required as a qualification for any office or public trust.' The question now presented is, whether the new constitution has repealed the provision of the ' act to suppress duelling,' in regard to the oath required to be taken by attorneys and counsellors of this court. The point is simply whether an attorney or counsellor holds an *office* or *public trust* in the sense of the constitution. Lexicographers generally define ' office' to mean ' public employment;' and I apprehend its legal meaning to be an employment on behalf of the government, in any station or public trust, not merely transient, occasional, or incidental. In common parlance, the term ' office' has a more general signification. Thus, we say the *office* of *executor*, or *guardian;* or the *office* of a *friend*. In my judgment, an attorney or counsellor does not hold an *office*, but exercises a *privilege* or *franchise*. As attorneys or counsellors, they perform no duties on behalf of the government; they execute no public trust. They enjoy the exclusive privilege of prosecuting and defending suits for clients who may choose to employ them. Various classes of persons are licensed in the city of New York, with an exclusive privilege in their employment; yet they are not public officers. Physicians are also licensed, pursuant to statutes; yet they hold no office or public trust, in legal construction. Lawyers are licensed to prac-

tise in one of the learned professions, and physicians in another; and there are many regulations by law for their government as distinct orders of men in society; but they are not trustees, nor agents, for the public, any more than persons licensed to carry on the business of banking. The fees of attorneys are fixed by law; and so is the compensation of cartmen and bakers and ferrymen. . . . The legislature, in framing the 'act to suppress duelling,' have discriminated between *public officers*, and *attorneys* and *counsellors*. They provide not only that ' persons elected or appointed to any office or place, civil or military,' but that ' persons *admitted* ' as *counsellors* and *attorneys*, shall take the oath: thus, by fair inference, giving an exposition which shows that *lawyers*, in their contemplation, were not *public officers*. I am therefore of opinion that the new constitution has not abrogated the provision of the act which required attorneys and counsellors to take this oath." *Platt*, J., in the *Matter of the Oaths to be taken by Attorneys and Counsellors*, 20 Johns. 492–494. *Woodworth*, J., concurred; *Spencer*, C. J., dissented. In *Seymour* v. *Ellison*, 2 Cow. 13, 28, 29, *Spencer*, C. J., expressed the opinion that an attorney holds an office within the sense of the constitutional provision that " neither the chancellor, nor justices of the supreme court, nor any circuit judge, shall hold any other office or public trust."

" So far as the legal profession is an occupation open to all, there is no reason to consider a lawyer as a public officer. The exercise of this profession is in part an occupation, in which every person is free to engage; but it is not so in respect to proceedings in the courts of justice. These proceedings are, according to our laws and usages, conducted by a distinct class of men specially appointed for this service. The practice of the law in the courts of justice is permitted only to those who are appointed by the courts; the persons appointed are subject to the control of the courts; and they may be deprived of their right to pursue this occupation. These regulations evidently consider the practice of the law in the courts as a part of the administration of justice; as a function important not merely to private parties, but also to the public. They are regulations which are supposed to be necessary or conducive to a good administration of public justice. The admission of an attorney, solicitor, or counsellor is a general appointment to conduct causes before the courts. This station, thus conferred by public authority, has its peculiar powers, privileges, and duties; and this station thus becomes an office in the administration of justice. Attorneys, solicitors, and counsellors are constantly denominated officers of the courts by which they are appointed. Our laws have required that upon their admission they should take a particular oath for the faithful discharge of their duties, and that oath is termed, by the legislature itself, an oath of office. In this, as in other regulations, the legislature have considered and treated persons appointed to practise the law

as holding a species of office. . . . The constitution of the Union requires that all executive and judicial officers of the United States and of the several states shall be bound by oath or affirmation to support that constitution. The supreme court of the United States have directed that counsellors 'and attorneys admitted to practice in that court shall take an oath or affirmation to demean themselves uprightly, and also to support the constitution of the United States. Rule of February term, 1790, and rule of February term, 1791. Attorneys and counsellors are thus considered by that court as officers of the United States, under the national constitution. . . . The obvious intention of the existing constitution [of New York] is to establish one oath for all offices and for every public trust: and I am accordingly of opinion . . . that no other oath can be required." *Sanford*, Chancellor, in *Wood's Case*, Hopk. Ch. 6–8.

"The general assembly shall have power to pass such penal laws to suppress the evil practice of duelling, extending to disqualification from office or the tenure thereof, as they may deem expedient. Every person shall be disqualified from holding any office, or place of honor or profit, under the authority of the state, who shall be convicted of having given or offered any bribe to procure his election or appointment. Laws shall be made to exclude from office, from suffrage, and from serving as jurors, those who shall hereafter be convicted of . . . high crimes or misdemeanors." Constitution of Ala. of 1819, *art.* 6, *ss.* 3–5. An act, passed in 1826, required " all members of the general assembly . . . and all officers and public functionaries, . . . and attorneys and counsellors at law," to take an oath that they had taken no part in a duel since Jan. 1, 1826, and would take no part therein during their continuance in office or in the discharge of any public function; and provided that " any attorney or counsellor at law, failing or refusing to take the said oath, shall not be permitted to practise as such in any court in this state." In *Dorsey's Case*, 7 Por. 293, it was held by a majority of the court that the requirement of this oath was not a constitutional method of disqualification. " *Goldthwaite*, J. . . . If a *statute* excluded from *office* one convicted of a particular offence, and used no other term of designation, I should not hesitate to decide that the profession of a lawyer was not included within the meaning of the term as generally used; because he can no more be said to hold an office than one who pursues the profession of a physician, the avocation of a teacher, or who discharges the functions of an administrator or guardian. But if I were called on to declare that the constitution, by these express grants, has not invested the general assembly with power to exclude from the exercise of these or similar professions, I confess I should very much doubt the propriety of such a construction. The present inclination of my judgment is, that those terms are sufficiently comprehensive to include all avocations, franchises,

professions, or functions, which are public in their nature, and which therefore may affect the constitution and well-being of society. . . . This act provides a mode of ascertaining and punishing guilt, which is . . . in direct contravention . . . of the declaration of rights. [*Pp.* 365, 367.] . . .

" *Ormond*, J. . . . The first question . . . is, whether the privilege or right to practise law is an *office*, within the meaning of *art.* 6, *s.* 3. The word office has two meanings—the one popular, the other legal and technical. Thus, we speak of the office of an executor, guardian, etc. The legal meaning of the term always implies ' a charge, or trust, conferred by public authority, and for a public purpose.' It is most unlikely that in framing a constitution of government its authors should have used a word of the importance of this, technical in its nature, . . . in a loose or popular sense. . . . ' Extending to disqualification from office, or the *tenure* thereof,' is quite conclusive of its meaning; for with no propriety of language could the *tenure* of an office be spoken of, unless it were an office of public trust. . . . Under the head of impeachments, we find that the governor and all civil officers shall be liable to impeachment for any misdemeanor in office. The term is general—*all civil officers*—and must embrace all persons holding an office within the purview of any constitutional regulation or restriction; yet no one, we apprehend, would contend that for malpractice, or for other good and sufficient cause, an attorney at law must be removed by impeachment before the senate. [*Pp.* 371, 372.] . . . *Collier*, C. J. [dissenting] . . . A license to practise law confers a mere franchise or privilege. . . . . It is conditional, depending for its efficacy upon taking the oaths prescribed by law. . . . Nor does an attorney and counsellor at law, *as such*, hold an office under the government. . . . Taking the law to have been correctly adjudged in the cases cited from 20 Johns. and 1 Munford, an attorney may be said to hold a privilege or profession. . . . Such only as are charged with the interests of the public are officers within the meaning of the constitution." *Pp.* 392–394, 413.

In *Faulkner's Case*, 1 W. Va. 269, it was held by a majority of the court that an attorney at law was not an officer within the meaning of an act of 1863 requiring " every person elected or appointed to any office " to take an oath that he had voluntarily given no aid or comfort to persons engaged in armed hostility against the United States. "*Brown*, J. . . . Whenever it was the legislative intention to embrace attorneys at law, they are named as such; and when not so intended they are not so named, and are not included by the general terms ' all officers elected or appointed.' . . . It would seem to be the settled understanding . . . that attorneys at law were not officers of the government, either state or national, elected or appointed, within the meaning of any of said acts relative to officers, civil or military ; but, on the contrary, that

they were a profession or class *sui generis;* and though called officers of courts, yet never in the sense of these acts, nor intended to be embraced by them." *P.* 285.

A California statute provided that "no attorney at law shall be permitted to practise . . . until he shall have taken and filed" an oath "that I have not, since April 25, 1863 [the date of the passage of the act], knowingly aided, encouraged, countenanced, or assisted, nor will I hereafter in any manner aid, encourage, countenance, or assist, the so called Confederate States, or any of them, in their rebellion." "It is insisted that the statute violates *s.* 3 of *art.* 11 of the constitution of this state," which requires "members of the legislature, and all officers, executive and judicial," to take an oath to support the constitutions, state and federal, and to faithfully discharge the duties of their office, and provides that "no other oath, declaration, or test shall be required as a qualification for any office or public trust." "It is insisted that an attorney at law is an ' officer;' that the privilege he exercises is an 'office' within the intent and meaning of this section, and that the affidavit required by the statute in question is another and a different oath, in the nature of a test oath, imposed as a qualification for the office, and that the law therefore conflicts with the constitution. . . . To construe this section to mean that a lawyer is an officer, would directly conflict with the well established meaning of other provisions in which the word officer is used. Thus, if it is an office it is one of profit, and an impeached officer would be disqualified from practising the profession, under *s.* 19 of *art.* 4; and senators and assemblymen who should vote to regulate attorneys' fees would be excluded from practising law by *s.* 20; and a lawyer, admitted to practice under the laws of the United States, would be a 'person holding a lucrative office under the United States,' and would not ' be eligible to any civil office of profit under this state,' and so would be excluded from practising in our state courts, or holding any office, by *s.* 21, and could not be governor under *s.* 12 of *art.* 5. If it is an office, it is liable to become 'vacant' by death, resignation, removal from the state, or otherwise, and would be governed by *s.* 8 of *art.* 5 [which authorizes the governor to fill vacancies]. If it is an office, a lawyer must be a 'judicial officer,' for his duties relate mainly to courts of justice, and he has always been termed an officer of the court. He would therefore be precluded from receiving ' to his own use any fees or perquisites of office.' [*Art.* 6, *s.* 11.] . . . If he is an officer, he must be elected or appointed, as required by *s.* 6 of *art.* 11, and the duration of the office cannot exceed four years, as prescribed by *s.* 7 of *art.* 11. . . .

"Attorneys are officers of the court, and as such are subject to the control of the court before which they practise, which has power to summarily investigate the dealings and transactions between them and their clients, . . . as also to disbar them for

misconduct and deprive them of the privilege of practising their profession. The books are full of decisions in which they are termed officers in this sense. And in some cases the courts have said, *arguendo*, that they are 'public officers,' on the ground that they receive stated fees fixed by statute and are subject to the control of the court. . . . But none of the cases we have been referred to hold directly, as a point actually decided, . . . that they are 'officers,' or 'public officers,' within the legal meaning of those terms when used in statutes and constitutions, except the case of *Wood*, in Hopk. Ch. 6, which is clearly overruled by the numerous cases to the contrary. We therefore hold that an attorney at law is not an officer, within the meaning of that term as used in the constitution." *Cohen* v. *Wright*, 22 Cal. 293, 307, 314, 315, 329.

A Tennessee statute made it the duty of all courts, "at every term for two years, to call before them all the officers thereof, who shall be sworn, and have this act read or explained to them." "Although in one sense an attorney is an officer of the court, yet that he does not belong to the class of officers referred to in this section is too clear to admit of discussion. . . . The idea that the legislature ever intended that the judges should call before them . . . all the attorneys of their respective courts, and have the acts of assembly read or explained to them, and have them sworn to disclose, as common informers, all their knowledge as to persons . . . who have been guilty of the offences in the act commonly known as the Ku-klux law, is so palpably absurd that it cannot be entertained for a moment. The language of the act plainly indicates that it was intended . . . to apply only to those persons who held offices, and who were subject to the orders of the court, but not to attorneys, who hold no office, and who are not subject to the order of the court except in well defined instances." *Ingersoll* v. *Howard*, 1 Heisk. 247, 254.

In *Thomas's Petition*, 16 Col. 441, 446, 447, the question arose whether a constitutional provision prohibiting the election or appointment to any civil or military office of any person except a qualified elector, excluded women from the bar. "Attorneys at law," say the court, "are constantly spoken of as 'officers of the court.' The designation is not inaccurate. Their special researches and general legal knowledge enable them to aid the courts, and thus to contribute toward the due administration of justice. The office is therefore an important one, and the attorney incidentally performs a *quasi*-public duty. But admission to the profession is purely a private matter, and is secured solely for the advancement of private interests. By virtue of such admission attorneys are not required to perform specific public acts, nor are specified duties devolved upon them in behalf of the general public. The duties they assume and the labor they perform are usually in pursuance of personal contracts with private litigants.

. . . Our conclusion is, that attorneys at law are not *per se* civil officers within the meaning of the constitutional phrase under consideration. . . . That instrument . . . contains nothing inconsistent with the admission of women to the bar."

A statute requiring locomotive engineers to be licensed, after examination as to competency and fitness, by a board appointed by the governor, is a police regulation providing "a proper mode of preserving the safety of the travelling public, and other persons, whose lives may be imperilled by the negligence of ignorant and incompetent engineers. . . . Laws providing by accustomed modes for the licensing of physicians, lawyers, pilots, butchers, bakers, liquor dealers, and in fact all trades, professions, and callings, interfere with no natural rights of the citizen secured by the constitution." *McDonald* v. *State*, 81 Ala. 279. The legislature may be of opinion that the public welfare requires a reasonable degree of skill and trustworthiness in physicians and lawyers, as well as in pilots, and that their business should not be carried on by persons to whom important interests cannot be safely intrusted. Statutes have authorized the selection of persons qualified for various employments, and the grant of licenses as evidence of their qualifications, and excluded all who did not obtain this evidence. Such regulations, adopted as a means of protecting the public against incapacity and unfitness, do ·not necessarily transform the licensee's business into a public office in such a sense as to exclude women. A legislative purpose to introduce a sexual test, and extend the legal disabilities of women, cannot be implied from a mere requirement of a license as a certificate that the holder is competent for a specified work. If the work is such as our common law allows a woman to do, the requirement of a license is no more evidence of an intent to disqualify women than of an intent to disqualify men.

" It shall not be lawful for any person to practise medicine, surgery, or midwifery, unless such person shall have obtained a license . . . stating that he is qualified in the branches of the medical profession named in said license. Every medical society . . . shall . . . elect a board of censors, . . . which board shall have authority to examine and license persons to practise medicine, surgery, or midwifery." Gen. Laws, *c*. 132, *ss*. 1, 2. " The object of the statute is protection to the public from incompetent and unworthy physicians and surgeons. . . . Authority to examine and license, as expressed in the statute, means authority to license, when, upon examination of the candidate as to his medical education, skill, and experience, the censors are satisfied that he possesses the necessary qualifications for the important and responsible occupation of a medical practitioner. . . . The license is in effect a certificate that the holder possesses the necessary medical and other qualifications." *Gage* v. *Censors*, 63 N. H. 92, 94. " The purpose of the statute is to protect the public

from the imposture and fraud of quacks and charlatans." *State* v. *Pennoyer*, 65 N. H. 113, 116.

The liquor law of 1838, *c.* 369, prohibited the sale of wine and spirits without license from the selectmen. One object of the act was "to place the trade in liquors . . . in the hands of suitable persons to be entrusted with such business." *Pierce* v. *State*, 13 N. H. 536, 582, 583. The act of 1791, "regulating licensed houses," provides that no person shall exercise the business of a taverner or retailer of wine or spirits without license ; and "that if the selectmen shall unreasonably neglect or refuse to license any suitable person applying therefor, such person, and suitable persons in towns and places where there are no selectmen, may apply to the court of general sessions of the peace . . . , who may, if they think proper, license such persons." One object of the statute was "to prevent improper persons from opening taverns." *Wason* v. *Severance*, 2 N. H. 501, 503.

The act of 1715 (Laws 1726, *p.* 57, Laws 1771, *p.* 57) presents the distinction between a public office and a business that cannot be carried on without a license. "No person," says the act, "who is or shall be licensed to be an innholder, taverner, common victualler, or retailer, shall suffer any apprentice, servant, or negro to sit drinking in his or her house, or to have any manner of drink there, without special order or allowance of their respective master. . . . Neither shall any licensed person suffer any inhabitant of such towns where he dwells, or coming thither from any other town, to sit drinking or tippling after ten o'clock at night in his or her house, . . . or to continue there above the space of two hours (other than travellers, persons upon business, or extraordinary occasions). . . . And no person or persons licensed as aforesaid shall suffer any person to drink to drunkenness or excess in his or her house, nor shall suffer any person as his or her guest to be and remain in such house, . . . on the Lord's Day (other than strangers, travellers, or such as come thither for necessary refreshment). And for the better inspecting of licensed houses, and the discovery of such persons as shall presume to sell without license, . . . the selectmen . . . shall take due care tythingmen be annually chosen at the general meeting for choice of town officers : . . . whose duty it shall be carefully to inspect all licensed houses, and to inform of" various police offences (with power to call offenders before a justice of the peace and to command assistance) ; "every of which tything-men shall be sworn . . . to the faithful discharge of his office," and shall have "a badge of his office. . . . If any person, being duly chosen to the said office, shall refuse to take his oath, or serve therein, he shall forfeit . . . forty shillings."

The position of a licensed attorney, like that of a licensed physician or a teacher of a public school, has a certain official character directly derived from the law. "An attorney is a public officer.

Admission to and expulsion from his office are regulated by law. He takes an official oath. The public is entitled to ample protection against the danger of any abuse of the great powers of the office which the public by its agents has conferred upon him. . . . The legislature could not have intended to . . . require another branch of the government to continue to hold him out to the world as worthy of confidence when the holding out becomes false and fraudulent." *Delano's Case*, 58 N. H. 5, 6; *Kimball's Case*, 64 Me. 140, 146. Women would not be barred from practising medicine or teaching school by a statute requiring an official oath, and a certificate from a judicial tribunal holding them out as worthy of confidence and employment in those callings.

Attorneys " constitute a profession essential to society. Their aid is required not merely to represent suitors before the courts, but in the more difficult transactions of private life. The highest interests are placed in their hands and confided to their management. The confidence which they receive and the responsibilities which they are obliged to assume demand not only ability of a high order, but the strictest integrity." *Randall* v. *Brigham*, 7 Wall. 523, 540. "Anything that tends to lower the standard of professional acquirements among those whose duty it is to investigate and defend the rights of others, is to be lamented. Every man may be a plaintiff or defendant. Every man may have a right to enforce, or an unjust claim to resist. . . . When he applies to an attorney for advice, he should have security, from the attorney's previous study of his profession, that he is reasonably competent to discharge his trust. There is no class of men whose advice in their particular calling is more generally followed than the class of attorneys. More implicit confidence is reposed in them, for personal honor and devotion to their duties, than in any other persons. Secrets involving all that renders life valuable are confided to them upon the mere security and belief that they will not violate a professional confidence. Evidences of debt and of rights to property are placed in their hands, for whose return other security than their professional trust is rarely required. It is even more important for the interest of the public than of the attorneys that this high character should continue to be deserved as it has been," and that they should be mentally and morally competent to act as legal advisers and draughtsmen, and " to take charge of litigated cases in court, involving as they do the life, liberty, reputation, and property of so many of their fellow-citizens." *Bryant's Case*, 24 N. H. 149, 153, 158.

Notwithstanding the importance and official character of an attorney's vocation, it is not generally regarded as a public office; and the question whether, in the work of his profession, he takes an official part in the government of the state, for which women are disqualified by the common law, must be determined by the

nature of the employment and not by the verbal test of his being called an officer of the court.   A common carrier " is in the exercise of a sort of public office, and has public duties to perform. . . .   He is bound to receive and carry all the goods offered for transportation."   *New Jersey S. N. Co.* v. *Bank*, 6 How. 344, 382; *Sandford* v. *Railroad*, 24 Pa. St. 378, 381.   " Like an innkeeper, he holds a sort of official relation to the public.   He is bound to carry at reasonable rates.   . . .   He cannot refuse to carry a proper article,   . . .   on the offer of the usual reasonable compensation.   . . .   When he undertakes the business of a common carrier, he assumes this relation to the public, and he is not at liberty to decline the duties and responsibilities of his place, as they are defined and fixed by law."   *Moses* v. *Railroad*, 24 N. H. 71, 88; *McDuffee* v. *Railroad*, 52 N. H. 430, 448.   " Railroads, . . .   like other highways, are public."   G. L., c. 160, s. 1. " Yet the officers who manage them   . . .   are not public officers " within the meaning of a constitutional requirement that the legislature " shall fix the term of office, and the compensation of all officers."   *Walker* v. *Cincinnati*, 21 Ohio St. 14.   Women are not excluded from a carrier's business by its public and official character.

" Offices, which are a right to exercise a public or private employment, and to take the fees and emoluments thereunto belonging, are also incorporeal hereditaments; whether public, as those of magistrates; or private, as of bailiffs, receivers, and the like." 2 Bl. Com. 36.   " Offices   . . .   consist in a right, and corresponding duty, to execute a public or private trust, and to take the emoluments belonging to it."   3 Kent Com. 454.   " If a man grant by his deed to another the office of parkership of a park, to have and occupy the same office for term of his life, the estate which he hath in the office is upon condition in law, to wit, that the parker shall well and lawfully keep the park."   Lit. Ten., *lib.* 3, s. 378.   " In this section Littleton putteth an example of a condition in law annexed to the office of the keeper of a park, but this example must be understood with a distinction; for if the parker doth not attend on the park one or two, &c. days, this is no forfeiture of the office of parkership; but if in his default any deer be killed, and so a damage to the lord, that is a forfeiture: for . . .   non-user of itself without some special damage is no forfeiture of private offices, but non-user of public offices which concern the administration of justice, or the commonwealth, is of itself a cause of forfeiture."   Co. Lit. 233 a; *Shrewsbury's Case*, 9 Co. 42, 50; *People* v. *Kingston & Middletown R. Co.*, 23 Wend. 193, 207, 208.   " Public offices are held upon the implied condition that the officer will   . . .   execute the duties belonging to them, and   . . .   if the officer refuses or neglects to exercise the functions of the office for so long a period as to reasonably warrant the presumption that he does not desire or intend to per-

form the duties of the office at all, he will be held to have aban-doned it." Mechem, Public Officers, *s.* 435; 3 Cru. Dig. 132.

"As a city physician . . . is by virtue of his office a mem-ber of the board of health, which is invested with important pow-ers to be exercised for the safety and health of the people, he is a public officer, and the title to his office can be tried by . . . a *quo warranto.*" *Com.* v. *Swasey,* 133 Mass. 538, 541. "*Quo warranto* will lie for usurping any office, whether created by charter alone, or by the crown, with the consent of parliament, provided the office be of a public nature, and a substantive office, not merely the function or employment of a deputy or servant held at the will and pleasure of others." *Darley* v. *The Queen,* 12 Cl. & F. 520. "An office, such as to properly come within the legitimate scope of a *quo-warranto* information, may be defined as a public position, to which a portion of the sovereignty of the country . . . attaches for the time being, and which is exer-cised for the benefit of the public." The jurisdiction covers " a great variety of offices of a public nature, both elective and ap-pointive, whose functions partake of an executive, ministerial, legis-lative, or judicial character." High Ex. Rem., *ss.* 620, 625, 626. The professional business of an attorney has not been understood to be an office within the law of abandonment and *quo warranto.*

"One Edward Hurst, an attorney of the town-court of Canter-bury, being turned out by the commissioners within the late act for corporations, moved now for a *mandamus.* . . . It was suggested that it is a place concerning the administration of jus-tice. . . . The court being divided in opinion, no writ could be had." *Hurst's Case,* T. Ray. 57. "A *mandamus* was granted in the case of Hurst, . . . and upon the return of the writ, restitution was granted, because an attorney is not such an office of which the commissioners for corporations have a power to inter-meddle." *Hurst's Case,* T. Ray. 94. An attorney admitted to practice in a federal court is an officer of that court; in that sense, his position is an " office under the United States;" but it is not an " office " within the meaning of the federal constitution, *art.* 1, *s.* 6, or the state constitution, *art.* 94. He " is not a civil, govern-mental, or public officer; he is not a holder of an office of public trust, within the meaning of the constitutions. . . . He is simply an officer of the court." Weeks Att. at Law 81.

"Public office " is sometimes used in a broad sense synonymous with " public duty." *Henly* v. *Lyme,* 5 Bing. 91, was case against a municipal corporation for not repairing sea walls according to the condition of a grant to it from the king. "If a man," says *Best,* C. J., "takes a reward—whatever be the nature of that reward, whether it be in money from the crown, whether it be in land from the crown, whether it be in lands or money from any individual—for the discharge of a public duty, that instant he becomes a public officer; and if by any act of negligence or any

act of abuse in his office, any individual sustains an injury, that individual is entitled to redress in a civil action. If that be so,. then it is quite clear that the plaintiff in this case is entitled to maintain this action." See *Foltz* v. *Kerlin*, 105 Ind. 221, 223. This definition does not include attorneys at law. The obligation to render public service, which the law imposes upon common carriers, and which is one of the ordinary characteristics of public office, is not an element in the business of the legal profession. "An attorney is neither a public officer nor an officer of the court in the sense in which a prosecuting attorney, a clerk, a sheriff, or coroner is an officer. . . . In the mere practice of his profession, he is not in the receipt either of a salary or fees allowed by law, but is simply engaged in a private pursuit. Consequently his. particular services cannot be required without compensation." *Ex parte Harrison*, 112 Ind. 329, 333. On this point the authorities are conflicting. Cool. Con. Lim. 406, 486. In this state an attorney is not compellable to engage in general or special practice,. or to render any professional service, upon tender of compensation. " It seems like a solecism to regard that to be an office, in this country, to which there are no duties assigned " (*Com.* v. *Gamble*, 62 Pa. St. 343), and in which an unlimited number of incumbents may remain during life, legally qualified and amply competent in fact, but refusing every request to perform official service, without incurring censure or liability, or being guilty of official neglect. If public office is erroneously defined as including duty, the inquiry may be merely whether a license to practise law is an appointment to a place of governmental power. Whether that power is or is not necessarily accompanied by duty, a right to. exercise it, in its electoral or official form, is not conferred upon women by the common law of this state.

In Rome and England and elsewhere, women have not been lawyers. The usage may have been regarded as universal law; but it is not conclusive on the question of legality. The callings. followed by women have multiplied without legislation, and there are others in which they are not found, but in which they can lawfully engage. Without a statutory or common-law rule closing any branch of any profession against them, public sentiment, based on prevailing views of natural law and public policy, might be practically equivalent to a legislative prohibition. " The paramount destiny and mission of women are to fulfil the noble and benign offices of wife and mother. This is the law of the Creator. And the rules of civil society must be adapted to the general constitution of things." *Bradley*, *Swayne*, and *Field*, JJ., in *Bradwell* v. *State*, 16 Wall. 130, 141. Men authorized to admit women to the bar, or to practise as attorneys, might deem it inexpedient to try the experiment. In certain social conditions, the legal question would not be likely to arise. Its first appearance would be expected in this age, and in this country. With a universal

opinion that the practice of law is not an employment fit for women, and with such a view of consequences as was expressed in *Goodell's Case* (*ante, p.* 209), the question in the minds of benchers and courts would be, not whether women could lawfully be admitted, but whether they could lawfully be kept out. When it was held that it could not be necessary that Mrs. Cobbett "should come into court [in behalf of her husband who was absent and in custody (*ante, p.* 229) ] to wrangle at *nisi prius*, and engage in scenes inconsistent with the character of her sex," it would not have been considered necessary or advisable that women should engage, professionally and habitually, in scenes thus described.

The principle by which the question of judicial power to grant the petition in this case is to be determined seems plain and simple, however difficult may be its application to other cases nearer the line that separates official from non-official employments. By our common law, women do not vote in town-meeting. The reason is, that voting is an exercise of governmental power. For the same reason, and by the same law, they do not hold public office. The reason of the rule does not exclude them from an occupation in which they would take no official part in the government of the country. The question is, whether an attorney at law is an officer of government within the reason and purpose of the rule. If a licensed attorney, being a public officer in a special and limited sense, is not a public officer in the ordinary sense, and by virtue of his office takes no official part in the government, the admission of women to the bar would not be a violation of our common law. If an attorney's occupation is a public office in the governmental sense, the admission of women will be illegal until the disability is removed by the legislature. The test cannot be found in anything so indeterminate as whatever concerns the administration of justice. Nothing concerns the administration of justice more than the part taken by men and women as witnesses in the trial of civil and criminal cases. Governmental power is not exercised by their testifying truly or falsely. Neither is it exercised by an attorney in advising a client, drawing a will, deed, declaration, or plea, questioning witnesses, or arguing upon their testimony.

Before appearance by attorney was allowed by acts of parliament, a person appearing as attorney for a party under a royal mandate may have been regarded as invested with a degree of official authority. After the passage of the act of 1402 (4 Hen. IV, *c.* 18), entitled "For Regulation of Attorneys," which required them to be "sworn well and truly to serve in their offices," there may have been little occasion to distinguish between their position as officers of the court, and the position of other officials who exercised powers of government. Serjeants at law, appointed by the king, may have been considered officers in a peculiar sense. All barristers might be accounted officers by those who denied that they were agents of their clients. To what extent attorneys and

counsel were understood to be government officers, and to what extent they were mere occupants of places assigned them in the social and legal ranks into which the whole community was divided, may be a question. 1 Bl. Com. 271, 272, 376, 396–408. Giving due weight to history, tradition, and usage, it does not appear that members of the New Hampshire bar are public officers in any other sense than that in which they are officers of the court. That sense is well understood, and is fully set forth and clearly defined in authorities before cited.

In determining whether an indictment shall be nol-prossed or tried, the attorney-general acts for the state in business in which he is the state's agent, exercises a portion of the power of the state, and performs an official duty. The prisoner's counsel is not employed by and does not act for the same principal, exercises no governmental power, and performs no official duty due from him to the state. As adviser, draftsman, and counsel for other parties than the state, he is the private agent of his employers. His admission to practice was not an admission to the state's service in an official or unofficial capacity. When retained by the state to bring a civil suit or prosecute an indictment, he does not become a state officer. When not retained by the state, he is not in the state's employment; and his vocation as an attorney, and an officer of the court (a public officer, in the special and limited sense explained by the authorities), with no power or duty of a governmental nature, is not a public office within the meaning and reason of the common-law rule which excludes women from government by withholding electoral and official power. Their exclusion from the exercise of legislative, executive, and judicial authority does not prevent their being licensed to practise as physicians or attorneys.

When the attorney-general employs counsel in a state case (G. L., c. 263, s. 2), there is a distinction between the position of the public prosecutor who acts in his official capacity, and the position of the attorney who renders service in pursuance of a contract. In every branch of the government illegal attempts may be made, by contract or license, to delegate official power to disqualified persons, minors, women, and aliens, and to adult male citizens. 61 N. H. 323–329. The inconvenience that may arise from this practice, and the difficulty (in some cases) of finding the line between official and non-official employment, are not a ground on which the existence or the necessity of the line can be denied, or on which it can be held that a woman cannot legally act as an amanuensis in drawing an indictment, or as an attorney in a civil or criminal case.

When the petitioner furnishes the evidence required by the rules, the question of her admission to examination (or admission to practise without examination, as a person who has been admitted and has practised in another state) will be considered.

All concurred.